**BURNDY CORPORATION, Plaintiff,**

v.

**F. L. CAHILL and National Connector Corporation, Defendants.**

Civ. 4–61–Civ.–73.

United States District Court
D. Minnesota,
Fourth Division.

Aug. 4, 1961.

**620**

Maslon, Kaplan, Edelman, Joseph & Borman, by Charles A. Cox, Minneapolis, Minn., and George M. Szabad, New York City, for plaintiff.

Larson, Lindquist, Fraser & Magnuson, by Arlen C. Christenson, Minneapolis, Minn., for defendant National Connector Corporation.

Oppenheimer, Hodgson, Brown, Baer & Wolff, by Sherman Winthrop and Robert B. Hawkins, St. Paul, Minn., for defendant F. L. Cahill.

DEVITT, Chief Judge.

This is a motion for a preliminary injunction (1) to enjoin defendant Cahill from remaining in the employ or aiding in any manner defendant National Connector or any other firm or corporation in the business of manufacturing or selling electrical connectors and (2) to enjoin defendant National Connector from employing defendant Cahill or using any advice or information received from Cahill. Jurisdiction is based on diversity of citizenship and claimed amount in controversy.

A statement of the facts as shown to the court by affidavits is necessary for an understanding of the issues involved.

Plaintiff Burndy Corporation (Burndy) is a New York corporation which has for years designed, manufactured and sold many types of electrical conductors and connectors for use in the electrical and electronics industries. Defendant National Connector is a Minnesota corporation which designs, manufactures and markets electrical connectors. Defendant Cahill is a Minnesota resident who has been employed as Sales Manager of National Connector since January 5, 1961.

Cahill, now 36 years old and a high school graduate, joined the H. H. Buggie Company (Buggie) of Toledo, Ohio in 1949. That company manufactured and sold electronic connectors. Eventually Cahill became Sales Manager of Buggie. In May, 1959, Burndy acquired all the assets of Buggie and continued to operate the business as the Toledo facility of its Omaton Division. Cahill continued his employment as Sales Manager of the Toledo facility.

On June 10, 1959, Burndy and Cahill entered into a written employment contract in the state of Ohio. The agreement contained a covenant not to compete.[1] In late 1960, Cahill learned that the Toledo facility sales department was

---

1. "(5) *Employee agrees*, subject to the conditions hereinafter stated, *that within two years after leaving the employ of Burndy* for reasons other than lack of work or other cause which, in the opinion of the Director or Industrial Relations of Burndy based upon uniform rules and operated in a non-discriminatory manner, was beyond the control of Employee, *Employee shall not engage or enter the employment of, or directly or indirectly act as an adviser or consultant, a sales*

being moved to Norwalk, Connecticut. Cahill did not want to move to Connecticut so he orally terminated his employment with Burndy on November 9, 1960 —effective December 15, 1960. At that time, his salary was $1,100 per month. During the weekend of December 17, 1960, Cahill was offered a job as Sales Manager of defendant National Connector which he accepted effective January 5, 1961.

This action was commenced April 3, 1961. The complaint states that Burndy will carry out its agreement to pay Cahill one-half of the monthly salary he was receiving from Burndy at the time he terminated his employment in the event Cahill is unable to secure suitable new employment. The complaint then demands injunctive relief against defendants Cahill and National Connector and,

in addition, demands damages in the sum of $688,450, plus costs.

It has previously been indicated that Burndy has moved for a preliminary injunction. At the same time, defendants moved for dismissal on the grounds that (1) the court lacks jurisdiction because the amount in controversy is less than $10,000 and (2) the complaint fails to state a claim against defendants upon which relief can be granted.

■ We must first determine whether jurisdiction exists. The statute,[2] 72 Stat. 415, 28 U.S.C.A. § 1332, now provides that in a diversity action the amount in controversy must exceed $10,000. It is often difficult to determine whether, in fact, the required jurisdictional amount is in controversy. The rules applicable to this decision were set out in St. Paul Mercury Indemnity Co. v. Red Cab Company, 1938, 303 U.S. 283,

---

*agent or broker, for any person, persons, partnership, firm or corporation * * * which is engaged in, or is about to become engaged in, the business of manufacturing and/or selling any electrical connectors and fuses* and any tools or other products used in the installation or application of such connectors and fuses. *Resignation from Burndy employment as a result of individual reduction of Employee's salary * * * shall be considered for the purposes of this agreement as a termination of employment for a cause which is beyond the control of Employee. The provisions of this paragraph shall apply only to an employee who (a) is in one of the following positions: (i) supervisory positions, (ii) positions of senior engineer, field or sales engineer, and salesman, and (iii) positions with a salary of $10,000 or more per annum, and (b) has become eligible to participate in the Burndy Pension and Retirement Benefit Program.* [Emphasis supplied.]

"(6) As a condition of Paragraph 5 of this agreement, if an employee who within three months after the end of the calendar month in which he leaves the employ of Burndy shall be unable to secure any suitable new employment or gainful occupation consistent with Employee's undertaking under said Paragraph 5, after having devoted his best efforts during said three-month period to find such employment, and notifies Burndy thereof by

registered mail, Burndy agrees as follows: Unless it notifies employee in writing that it elects not to enforce the terms of said paragraph '5', it shall forward to Employee at the end of each month thereafter for so long a time as it elects to continue to enforce said paragraph '5' until such time as Employee is able to find employment consistent with terms of this agreement, a check in the amount equal to one-half of the monthly salary * * * Employee was receiving at the date of his leaving the employ of Burndy * * *."

2. "§ 1332. Diversity of citizenship; amount in controversy; costs

"(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum * * * of $10,000, exclusive of interest and costs, and is between—

"(1) citizens of different States;

* * * * * *

"(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff."

288, 58 S.Ct. 586, 590, 82 L.Ed. 845, as follows:

"The intent of Congress drastically to restrict federal jurisdiction in controversies between citizens of different states has always been rigorously enforced by the courts. The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of valid defense to the claim. But if, from the face of the pleading, it is apparent, to a legal certainty, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed."

The general standard is so flexible and broad that many cases undoubtedly get tried in federal court that do not belong there.[3]

■■ It is clear that the plaintiff must prove that the jurisdictional amount is in controversy if it is challenged by the defendant or the court. See McNutt v. General Motors Acceptance Corp., 1936, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135; Federated Mutual Implement and Hardware Ins. Co. v. Steinheider, 8 Cir., 1959, 268 F.2d 734. In an injunction action, the amount in controversy is to be tested by the value of the right to be protected and, in this case,

the right to be protected against is the right of Burndy to be free from Cahill's competition to the extent of the terms of the contract. See Federated Mutual Implement and Hardware Ins. Co. v. Steinheider, supra.

Burndy argues that Cahill is an outstanding salesman familiar with its whole operation including costs, designs, suppliers and customers. It claims that Cahill is now working for a competitor in an area where it has a lot of business and it asserts that since Cahill started working for National Connector, that company has made sales to several of Burndy's major customers. Burndy submits that sales of its facility at Toledo for the last fiscal year exceeded $3,900,000, and in this connection it states that its sales in 1960 to three Twin Cities companies, namely, Control Data Corporation, Remington Rand Corporation and Minneapolis Honeywell, amounted to more than $845,000 with a net profit of $42,000. It contends that, since its gross profit on Connector products is in excess of 30 percent (after manufacturing and selling cost but before administrative overhead), Cahill's employment with National Connector need divert only $35,000 in business between the commencement of Cahill's employment with National Connector and December 15, 1962, in order to take at least $10,000 in gross profits from Burndy.

Cahill and National Connector argue that information as to costs and design wouldn't help National Connector because of frequent changes in this field, and that potential customers are known to the whole trade. Defendants submit that the groundwork for any sales made by National Connector to customers of Burndy started long before Cahill became associated with National Connector.

It is my impression that Cahill is not quite so valuable as Burndy makes him out to be and not quite so average as

3. For a comprehensive history of jurisdictional amount in diversity litigation, see 1958 U.S.Code Congressional and Administrative News, Vol. 2, p. 3099 et seq.; Wade v. Rogala, 3 Cir., 1959, 270 F.2d 280; Lorraine Motors, Inc. v. Aetna Casualty & Surety Co., D.C.E.D.N.Y.1958, 166 F.Supp. 319.

National Connector contends. Cahill has spent some twelve years as a successful salesman in the connector field and has undoubtedly developed many contacts. I cannot say on the basis of the record at this time that Burndy will suffer $10,000 in damages as a result of Cahill's employment with National Connector, nor can I say that Burndy won't suffer $10,000 damages. Defendants rely on Federated Mutual Implement and Hardware Ins. Co. v. Steinheider, supra, in their assertion that this case should be dismissed for lack of the jurisdictional amount. The situation in that case is very similar to the instant case. However, in the Federated case, the court dismissed the action after a trial on the merits. Since all the proof was in, the court was able to make a determination that there was no showing by a preponderance of the evidence that the value of the right sought to be protected would exceed $10,000. The motions in this case are based on affidavits.

■ It has been recognized by the courts that in an injunction action, the injury, if any, is not susceptible of exact valuation in monetary terms. See City of Memphis v. Ingram, 8 Cir., 1952, 195 F.2d 338; Food Fair Stores v. Food Fair, Inc., 1 Cir., 1949, 177 F.2d 177. While an allegation of the magnitude of Burndy's operations is not alone sufficient to show the requisite jurisdictional amount, See Kvos, Inc. v. Associated Press, 299 U.S. 269, 279, 57 S.Ct. 197, 81 L.Ed. 183; McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 180–181, 56 S.Ct. 780, 781, 80 L.Ed. 1135, it appears, at least at this stage of the proceeding, that there is a present probability that Burndy could suffer damages in excess of $10,000.

Defendants also move to dismiss because the complaint fails to state a claim upon which relief can be granted. In this connection, defendants contend that the covenant not to compete involved herein is unenforceable and void ab initio because it is unlimited in scope as to territory or space. The contract was made in Ohio and both parties agree that the law

of Ohio controls in the determination of whether this negative covenant is enforceable. See Combine Ins. Co. of America v. Bode, 1956, 247 Minn. 458, 77 N.W.2d 533.

The Ohio law with respect to restrictive covenants was first established by that state's highest court in the 1853 case of Lange v. Werk, Sup.Ct.1853, 2 Ohio St. 519. In that case, the covenant restricted the defendant from working in the star-candle or stearin business "at any place within the county of Hamilton, in the State of Ohio, or at any other place whatsoever in the United States of America." The court held that the covenant was void insofar as it extended to the United States but determined that the covenant was divisible since it could be split into its various parts because of the manner in which the wording was framed. Consequently, although the broader portion including the United States was void, the clause in the covenant relating to Hamilton County was enforced. As stated later in Lufkin Rule Co. v. Fringeli, Sup.Ct. 1898, 57 Ohio St. 596, 49 N.E. 1030, 1032, 41 L.R.A. 185, referring to the Lange case:

"The covenant was regarded as divisible and that that part of it which bound Lange not to pursue the business or give his assistance at any place in the United States was void, being in general restraint of trade; but, as to Hamilton county, it was held that if it were attended with certain other necessary requisites, it might be good. These requisites were stated to be: (1) That the restraint was partial; (2) that it is founded on a valuable consideration; and (3) that the contract is reasonable, and not oppressive,—the presumption being always, in the first instance, that it is illegal and must be overcome by the party seeking to enforce it, before relief can be had."

In 1926, the Court of Appeals of Ohio for Hamilton County decided the case of Emler v. Ferne, Ct.App.1926, 23 Ohio App. 218, 155 N.E. 496, 497, wherein the

covenant prohibited defendant from establishing a beauty parlor for a period of ten years. The contract contained no provision as to area. The court, in voiding the contract, referred to the Lange and Lufkin Rule cases and said:

" * * * our supreme court of Ohio found that a blue pencil might be run through that part of the covenant referring to the United States and not affect the meaning of the remaining part with respect to Hamilton county. Had the covenant in the contract under consideration provided that Emler should not engage in a business of his own for ten years in the city of Cincinnati, or elsewhere, the covenant would have been upheld, and the trial court would have been correct in so holding. But there is no such limitation. The ten-year covenant, as above stated, is without territorial limitation, and if that part is blue penciled, there is nothing on which to base a restriction. That it is not divisible is clearly decided in the case of Lufkin Rule Co. v. Fringeli * * * ".

Later in the opinion the court reasoned further as follows:

"The negative covenant as to space is a general restraint of trade, and is not divisible. Had the covenant provided that the parties should not engage in the same or similar business for the period of 100 years, it would not be contending that the court might grant the injunction for a period of 5 years. In other words, the court cannot make the contract for the parties. He cannot place a restriction on a negative covenant, where there is no valid negative covenant."

The next case in the series is Briggs v. Butler, Sup.Ct.1942, 140 Ohio St. 499, 45 N.E.2d 757, 761; 71 Ohio App. 48, 47 N.E.2d 812. In the Briggs case, defendant left the employ of plaintiff and started a competitive business in conjunction with her husband. The covenant provided that "she will not * * * for a period of five whole years thereafter, engage * * * in the same kind or similar business, in competition with the company in Toledo, Ohio, and/or in any city, town, borough, township or other place in the United States and Canada, in which the company is then engaged in rendering its service." The lower court enjoined the defendant but limited the injunction to the City of Toledo. On appeal, the Court of Appeals for Lucas County in a de novo proceeding rendered judgment against the plaintiff. The Supreme Court reversed and agreed with the lower court that the defendant should be enjoined—*but only in the City of Toledo*. It should be noted that the wording of the negative covenant in relation to area and the result in the Briggs case are very similar to the 1853 Lange case.

The court in the Briggs case approved the rule that agreements whereby an employee undertakes not to enter into a competing business are upheld—

" ' * * * if they are no wider than reasonably necessary for the protection of the employer's business, and do not impose undue hardship on the employee, due regard being had to the interests of the public.' "

The court went on to say that—

"The determination of the necessity for such restriction is dependent upon the nature and extent of the business and the nature and extent of the service of the employee in connection therewith and other pertinent conditions.

" * * * it is quite generally held that contracts whereby salesmen, agents, canvassers and other employees who come into personal contact with their employer's customers agree not to engage in a competing business within a limited time or area after leaving their employer's service are valid and enforceable; contracts or restricted employment which are deemed invalid are those which impose a restraint held to be wider than reasonably required for

the protection of the employer's business, or unreasonably restrictive upon the rights of the employee, or in contravention of the public interest * * * "

The defendants argue, of course, that the Briggs case is no more than an affirmation of the previous Ohio rule set down in the Lange, Lufkin Rule and Emler cases that a covenant unlimited to territory or space will be void unless it contains several clauses—one of which encompasses a smaller area that could be construed to be a reasonable restriction under the circumstances. Burndy contends in this connection, however, that the court in the Briggs case distinguished restrictive covenants incident to the sale of a business from restrictive covenants in employment agreements. They rely on the following statement of the court, set out at page 763 of 45 N.E.2d, as follows:

"The conclusion reached upon the particular facts in this case are in no wise inconsistent with the results reached and announced in the following cases, each of which involved conditions * * * in contracts involving the purchase and sale of interests in business: Lange v. Werk, 2 Ohio St. 519; Thomas v. Adm'r of William P. Miles, 3 Ohio St. 274; Morgan v. Perhamus, 36 Ohio St. 517, 38 Am.Rep. 607; Lufkin Rule Co. v. Fringeli, 57 Ohio St. 596, 49 N.E. 1030, 41 L.R.A. 185, 63 Am.St. Rep. 736; or in Curry v. Marquart, 133 Ohio St. 77, 11 N.E.2d 868, which involved an employment contract containing no restrictive covenant whatever."

Plaintiff Burndy, I think, misreads the court's comment. In my opinion, the court was merely identifying the nature of the covenants and saying that it agrees with the decisions in those cases. Most of those cases, as did Briggs, contained divisible negative covenants. I am satisfied that the court in the Briggs case did exactly as the court did in the Lange case in 1853; that is, "blue pencil" the part of the restriction relating to any city or

town or other place in the United States and Canada. There is support for this interpretation of the Briggs case. See Segal v. Fleischer, 1952, 93 Ohio App. 315, 113 N.E.2d 608, 610. The court commented on this point, as follows:

"The Common Pleas Court 'blue penciled' that part of the restriction reading 'and/or in any city, town, borough, township or other place in the United States and Canada, in which the company is then engaged in rendering its service', and granted injunctive relief to plaintiff confined to the city of Toledo.

* * * * * *

"No comment or reference to the actual 'blue penciled' effect given to the restriction appears in the Supreme Court opinion. We, therefore, do not know whether or not had the language of the restrictive covenant not been susceptible of 'blue pencilling' the court would have reached the same conclusion."

The court in the Segal case, decided ten years after Briggs, declared a restriction unenforceable which attempted to prevent salesmen from engaging in competitive employment for five years after leaving the employer without limiting the restriction in any manner as to territory. The court said:

"The case at bar contains no restriction as to space * * * and therefore, fails to meet the requirement of being reasonably limited as set forth in the syllabus of the Briggs case."

In addition to the Briggs case, plaintiff Burndy relies on an unreported Ohio decision, Minnesota Mining & Manufacturing Co. v. Shuler, No. 635,064 in the Court of Common Pleas of Cuyahoga County, Ohio. In that case, the covenant not to compete contained no area or space limitation. The Common Pleas Court upheld the negative covenant on the basis that Minnesota Mining's business was world-wide and, consequently, the negative covenant did not have to be restricted to any particular city, state or terri-

tory in order to be valid. The court relied on the Briggs case saying that it was "most nearly in point." The Court of Appeals for Cuyahoga County affirmed in a per curiam decision.

The Shuler case does not appear to represent the law of Ohio regarding negative covenants unrestricted as to area or space. A letter from the Judge of the Common Pleas Court to the attorneys constituted the memorandum decision in that case. The court stated that the facts in the Shuler and Briggs cases differed only in that actual injury had occurred in the Briggs case whereas it had apparently not occurred in the Shuler case. It seems to me that one other important distinction existed; that is, the Briggs case, as previously noted, contained a divisible covenant and the court upheld only that part of the covenant covering the city of Toledo while in the Shuler case, the covenant was unrestricted as to area or space and obviously no division could be made. See also Droba v. Berry, Ohio Com.Pl.1955, 139 N.E.2d 124; Toulmin v. Becker, Ohio App.1954, 124 N.E.2d 778; Hubman Supply Co. v. Irvin, Ohio Com.Pl.1953, 119 N.E.2d 152.

Plaintiff also cites Conforming Matrix Corp. v. Faber, Ct.App.1957, 104 Ohio App. 8, 146 N.E.2d 447, 451. In that case, an engineer was enjoined from competing with his former employer in the State of Ohio. The negative covenant involved therein restricted the defendant employee from competing in some 19 states and Ontario, Canada. The area in that case was limited and the court found that enjoining the defendant from competing in Ohio was not unreasonable. While the court in the Conforming Matrix case in effect belittled the Ohio rule that a negative covenant unrestricted as to area was void ab initio,[4] the court failed to show where the Supreme Court of Ohio had changed the law in this respect. The court relied on the Briggs

case but, as previously noted, that case involved a divisible covenant and the court in the Briggs case did not modify the prior Ohio law that a negative covenant unrestricted as to area was void ab initio.

 This court cannot change Ohio law. Even though we might disagree with it, we are obligated to follow it.[5]

It is my opinion that were the Supreme Court of Ohio called upon to rule on the enforceability of the negative covenant involved herein, it would hold that the unlimited restriction as to area was wider than reasonably necessary for the protection of Burndy's business, and that the covenant, being indivisible, was void ab initio.

Defendants' motion for dismissal is granted.

---

4. "The Supreme Court in the Briggs case, supra, had no difficulty in granting injunctive relief for the proved breach of the contract, notwithstanding some other decisions in Ohio employing a strict, if not legalistic, construction of the restrictive covenants peculiar to the facts in those cases, * * *."

5. The Ohio rule is in the minority. 1955, 43 A.L.R.2d 94, 125.