Dieter HULSENBUSCH, Appellant,

v.

The DAVIDSON RUBBER COMPANY, Inc., Appellee.

No. 17785.

United States Court of Appeals Eighth Circuit.

April 21, 1965.

Rehearing Denied June 23, 1965.

John L. Vanker, Jr., of Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., and R. Richard Bittner, of Betty, Neuman, Heninger & McMahon, Davenport, Iowa, for appellant. Richard M. McMahon, Davenport, Iowa, and John L. Vanker, Jr., Detroit, Mich., on the brief.

Robert B. Russell, of Russell, Chittick & Pfund, Boston, Mass., for appellee. Russell, Chittick & Pfund, Boston, Mass., and Lane & Waterman, Davenport, Iowa, on the brief.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

Defendant, Dieter Hulsenbusch, a citizen of West Germany, has appealed a decision of the District Court enjoining him from further breach of the employment contract he executed with his former employer and plaintiff below, The Davidson Rubber Company, Inc. of Dover, New Hampshire.

The Davidson Company is presently engaged in the manufacture primarily of interior automotive parts such as padded dashboards (crash pads), arm rests and sunvisors. Hulsenbusch's business relationship with Davidson had its beginning in 1958 while he was employed as a technical consultant with the Happich Company of West Germany which also manufactures interior automotive parts for several German-made automobiles.

During a visit in that year to several crash pad producers in the United States, Hulsenbusch and his employer, Dr. Otto Happich, made contact with officials of Davidson in order to learn their process for manufacture of a certain type of "foamed-in-place" arm rest with which they were impressed and wished to duplicate for their own customers.

As a result of this meeting, Davidson divulged its techniques for the production of arm rests to Hulsenbusch. Thereafter, Davidson issued a license for consideration to the Happich Company covering the following subject matter:

"[M]olded articles employing molded urethane foam alone or such foam and vinyl combinations, including developments in the articles themselves, apparatus for producing them, formulations, materials handling techniques, and the like. * * *"

During the interim Hulsenbusch had agreed to keep this information confidential. He ultimately signed an employment agreement with Happich in which he agreed for the duration of his employment and two years after separation (1) not to disclose information entrusted to him regarding formulas, production procedures, and special machinery used in the mold making and plastics

processing of his employer and (2) not to work for himself or a competitor of Happich (other than a firm under Davidson's control) which produces automotive items of the same type as covered by the Davidson-Happich license.[1]

On one occasion during this period of his employment with Happich, Hulsenbusch informed a representative of Davidson by letter that he had declined permission to a competitor of Davidson to see or discuss Happich's work with respect to the production of arm rests or crash pads. Hulsenbusch indicated that his basis for refusal was belief that their license with Davidson covered patents and confidential "know-how" of Davidson on which these two areas of Happich's production depended.

Subsequently, Davidson decided to enter the crash pad market in the United States. After learning of Hulsenbusch's intention to leave Happich to take a job with a similar manufacturer in Italy, Davidson's president, E. Paul Casey, hired Hulsenbusch in November of 1962 as a short-term technical consultant and project leader of their planned expansion into the crash pad field. Defendant was to be paid $1,000.00 per month, a bonus, and certain fringe benefits while residing in the United States. Casey confirmed this oral employment agreement by written instrument dated November 5, 1962. In this communique, which Hulsenbusch later signed in New Hampshire before assuming his duties, Casey specified:

"3. It is my understanding that you currently have a contractual obligation to Happich which extends for approximately 2 years in which you agree not to work for competitors of his in Europe and that your proposed employment contract with Gallino will contain a similar provision for Italy. *We expect you to observe the same kind of restrictions for the U.S.*

"4. It is also agreed, in line with the customary ethical practices of consultants, that any new developments or inventions resulting from your work with us will become the property of Davidson Rubber Company." (Emphasis supplied.)

Thereafter, Hulsenbusch, working in close association with Davidson's research director, chief engineer and their technical staffs, helped in the successful six-month development of a marketable crash pad.

In one year of production, Davidson, by 1964, had acquired crash pad business with General Motors, Chrysler and Ford amounting to over $5,000,000.00 worth of sales. Included in this figure were substantial orders awarded Davidson after its leading competitor, the Sheller Manufacturing Company of Keokuk, Iowa, was unable to fulfill some of its contractual commitments to the automotive industry.

When Davidson became established as a leading crash pad producer, Hulsenbusch's job was complete. He left Davidson's employ on July 31, 1963 and took a consultancy position with a French company which at that time manufactured certain interior automotive parts other than crash pads.

Hoping to recapture market advantage, officials of Sheller contacted Hulsenbusch, whose expertise they had heard put Davidson in the crash pad business. On March 31, 1964, Hulsenbusch was offered and accepted employment with Sheller as a consultant on crash pads at

---

1. "2. *Coverage of Prohibition of Competition and Bond of Secrecy*

"Mr. Hulsenbusch obligates himself, for a period of two years after severance of employment, not to work for an enterprise that produces or deals in the following items for the automotive branch:

"1. Parts made of PVC-Plastisol, produced by the rotary method, the injection-molding method or the swivel method.

"2. Parts as above, foamed with polyurethane foam.

"3. Parts as above with reinforcing or protection elements, in which the said elements are foamed in.

"4. Parts as above, in which the shell is made of molded thermoplastic foil."

a salary of $34,000.00 for six months' work.

When President Casey of Davidson finally learned on May 14, 1964 of Hulsenbusch's employment with Sheller, he immediately telephoned the president of Sheller, as well as Hulsenbusch. He informed both that Hulsenbusch's employment contract with Davidson precluded his consulting for a competitor such as Sheller in the making of crash pads for two years following separation with Davidson. Sheller and Hulsenbusch disagreed. Whereupon Davidson filed the instant bill in equity in federal district court based on diversity jurisdiction seeking immediate injunctive relief which was awarded below.

After a trial on the merits, the District Court made permanant its temporary injunction restraining the defendant from continuing in the employ of, or disclosing any technical information to Sheller, its representatives, or any other company in the United States in direct competition with plaintiff in the automotive industry until August 1, 1965. A motion for an order staying the injunction pending appeal was denied.

Defendant first attacks the jurisdiction of the District Court on the ground that the amount in controversy does not exceed $10,000.00, exclusive of interest and costs, as required under 28 U.S.C.A. § 1332(a). Defendant maintains that plaintiff's president admitted that as of the time of trial plaintiff had suffered no actual monetary damage, and although crash pad contracts for 1965 had already been awarded, plaintiff failed to show that it was incapable of carrying on its business as in the past or that freedom from defendant's employment with Sheller is worth $10,000.00. On the other hand, plaintiff's president Casey testified that at least $2,000,000.00 worth of their gross business had been acquired as a result of trade secrets developed during defendant's tenure. He was of the opinion that if defendant divulged this proprietary information, to which he had access, to Sheller, plaintiff stood to lose anticipated profits ranging from $600,000.00 to $800,000.00.

■ Ordinarily, the presence of jurisdictional amount rests upon the plaintiff's good faith allegation in its complaint or bill in equity. But where appropriately controverted by the defendant, the plaintiff has the burden to support its averment by competent and preponderant proof. KVOS, Inc. v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936); Ringsby Truck Lines, Inc. v. Beardsley, 331 F.2d 14 (8th Cir. 1964); Industrial Electronics Corp. v. Cline, 330 F.2d 480 (3rd Cir. 1964).

■ In an equitable action for an injunction against irreparable injury, the amount in controversy is determined by the value of the property right sought to be protected against the alleged interference. Federated Mutual Implement & Hardware Ins. Co. v. Steinheider, 268 F.2d 734 (8th Cir. 1959); Beneficial Industrial Loan Corp. v. Kline, 132 F.2d 520 (8th Cir. 1942); Burndy Corp. v. Cahill, 196 F.Supp. 619 (D.Minn.1961). Translated into the facts of the instant case, that right is definable as plaintiff's alleged entitlement under the employment contract to be free from the defendant's disclosure of its specified proprietary trade secrets to a competitor in the United States for two years following severance of the employment relationship. While such a right is not susceptible of exact evaluation, the weight of authority in trademark-tradename and unfair competition suits generally permits evidence of potential, as well as past, damages in arriving at the dollar value of the subject matter of the lawsuit. Hanson v. Triangle Publications, 163 F.2d 74 (8th Cir. 1947); Ury v. Mazer Cigar Mfg. Co., 253 F. 551 (8th Cir. 1918); Moline Plow Co. v. Omaha Iron Store Co., 235 F. 519 (8th Cir. 1916); Beneficial Industrial Loan Corp. v. Kline, supra 132 F.2d at 525; Burndy Corp. v. Cahill, supra; 54 Am.Jur., United States Courts, §§ 123–124 (1945). [See also 1 Moore's Federal Practice,

¶0.96 [2] (2nd ed. 1964) approving consideration of prospective damages in computing jurisdictional amount in an action for an injunction, generally.] We see no reason to apply a more stringent criterion in determining the jurisdictional amount in an *unfair competition* suit based on disclosure of trade secrets in breach of contract.

The evidence is undisputed that plaintiff was awarded, as against its competitors, substantial contracts for crash pads which it successfully fulfilled and derived profits therefrom far in excess of $10,-000.00 following the development stage when defendant was employed. It has since acquired an even larger and more lucrative share of the crash pad business allegedly attributable to technical innovations made during this prior period. Therefore, if plaintiff is correct in its allegation that these innovations constituted exclusive, proprietary trade secrets of which the defendant was aware, then we have no doubt that the value of its right to be safeguarded against disclosure of this information by defendant to its competitors is worth exceedingly more than $10,000.00.

■ Moreover, from the viewpoint of the defendant, his disputed right to work for a competitor of plaintiff within the United States during the next two years is valued at $34,000.00 for only six months' work under his contract with Sheller which also would far exceed the requisite jurisdictional amount. Thus, we do not believe the District Court erred in finding sufficient evidence of controverted amount to vest it with jurisdiction.

The core of defendant's appeal is his contention that while employed by plaintiff he learned none of its asserted trade secrets nor was he entrusted with any confidential information dealing with plaintiff's processes for the manufacture of crash pads. Defendant therefore submits that he did not breach the restrictive covenant of his non-competition agreement with plaintiff by accepting a consultancy position with Sheller to improve its crash pads because the job would utilize only his general experience and skill in areas of crash pad production openly known to the industry.

We note that the parties regarded the substantive issues governed by either the law of Iowa, the forum, or that of New Hampshire where the Davidson employment agreement was executed. We see no need to dwell on this conflicts of law question as both jurisdictions apparently embrace the general weight of authority with respect to trade secrets and the enforceability of restrictive covenants not to compete. See Dunfey Realty Co., Inc. v. Enwright, 101 N.H. 195, 138 A.2d 80 (1957); Cogley Clinic v. Martini, 253 Iowa 541, 112 N.W.2d 678 (1962); Mutual Loan Co. v. Pierce, 245 Iowa 1051, 65 N.W.2d 405 (1954); Brecher v. Brown, 235 Iowa 627, 17 N.W.2d 377 (1945).

■ In Sandlin v. Johnson, 141 F.2d 660 (8th Cir. 1944), we recognized and approved the general rule that a trade secret consists of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. The subject matter of a trade secret must be secret as one can no longer claim a proprietary interest to information which becomes known to the industry by a general disclosure or a legitimate discovery. Restatement, Torts, § 757 Comment (b); B. F. Gladding & Co. v. Scientific Anglers, 245 F.2d 722 (6th Cir. 1957); see also Harris Mfg. Co. v. Williams, 157 F.Supp. 779 (W.D.Ark.1957).

■ The issues of possession by plaintiff of trade secrets, confidential disclosure to defendant, and violation by him of that confidence or breach of his contract are largely factual and in a nonjury case left to the trial court's determination, which is conclusive if supported by substantial evidence. Venn v. Goedert, 319 F.2d 812 (8th Cir. 1963); Sandlin v. Johnson, supra. We are satis-

fied that the District Court's findings in the affirmative on these issues are amply supported by the record of evidence, including the many exhibits, and do not warrant reversal as clearly erroneous.

Without detailing, we note some of the evidence on which the District Court perhaps relied. The defendant was hired specifically to aid plaintiff enter the crash pad field. It appears his instrumental contribution was in the development of a crash pad mold which in the jargon of the trade incorporated such new features as a "foamed-in-place structural part" and a "pre-trimmed or self-sealed edge." Defendant was not a trained chemist, nor did he consult directly on the laboratory experiments dealing with the plaintiff's development of a formula for a so-called "void-free foam" which substantially solved a problem besetting the crash pad industry for some time. However, he worked in close conjunction with plaintiff's research director, had access to such information, and was observed by several employees taking notes and having in his possession confidential data respecting the foam formulations.

It appears that as a result of this combination of qualities, plaintiff's crash pads achieved immediate acceptance and preference over its competitor, Sheller, by the big three automobile manufacturers. We think the evidence justified the finding that plaintiff's processes as a whole utilized trade secrets not generally known or used in the industry which enabled it to gain an advantage over its competitors. See Ferroline Corp. v. General Aniline & Film Corp., 207 F.2d 912, 921 (7th Cir. 1953), cert. denied 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954).

Furthermore, the defendant himself recognized the secrecy of plaintiff's processes when in memoranda and correspondence he praised the superior "know-how" of plaintiff. Sheller officials apparently agreed that highly advantageous innovations had been attained by plaintiff during the defendant's employ and believed that he was primarily responsible for putting plaintiff in the crash pad business. A Sheller representative located defendant in France, and arrangements were made for his personal interview in the United States under instructions to "pick his brain" and see "if he had anything to sell as a consultant" in crash pad production. Apparently convinced of defendant's valuable potential in this regard, the Sheller company hired him at the inordinate salary of $34,000.00 for six months' work. By the terms of that contract, defendant agreed to make known to Sheller all his knowledge in the field of crash pad engineering and production, notwithstanding his former agreement to the contrary with plaintiff. Moreover, defendant's testimony indicated that by this time he had forgotten his past outspoken loyalty to plaintiff. His actions, as well, demonstrated that he no longer intended to protect the secrecy of any of the information entrusted to him by plaintiff in confidence which he previously had regarded as plaintiff's exclusive "know-how" while on its payroll. At the time of trial, defendant had already visited Sheller's crash pad factory and begun his services as a consultant.

Based on these and other circumstances, we reiterate that the District Court's findings regarding the breach of contract charge were substantiated.

And finally defendant contends that the restrictive covenant of his non-competition agreement with plaintiff is unenforceable because of vagueness and the fact that its scope and duration place an unreasonable restraint on trade.

Even in the absence of the broad subject matter covered by the secrecy pledge in the Happich contract to which defendant understandingly agreed to be bound by reference in his contract with plaintiff, we would be compelled to hold under the well established rule that the defendant was "precluded from using for his own advantage, and to the detriment of his former employer, information or trade secrets acquired by or imparted to him in the course of his employment." 35 Am.Jur., Master and Servant § 99 at 528 (1941); 56 C.J.S. Master

and Servant § 72 at p. 484 (1948); see e. g., O. & W. Thum Co. v. Tloczynski, 114 Mich. 149, 72 N.W. 140, 38 L.R.A. 200 (1897). And we have heretofore concurred with the District Court's finding that the defendant possessed knowledge of trade secrets belonging to plaintiff.

 In those cases where the employee agrees in writing not to compete with his former employer, the test of the restrictions' validity is whether the restraints imposed are reasonably necessary for the protection of the employer's business and are not economically oppressive to the employee. See 35 Am. Jr., supra. Plaintiff's business of manufacturing crash pads is part of the nationwide automotive industry. A restriction in area to the United States has been held reasonable when this territory was coextensive with the employer's trade. See cases collected Annot. 43 ALR 2d 94, § 125 (1955). Likewise, there is respectable authority holding that a two year time limitation to run from the date of separation with the former employer may be necessary for protection of the employer's trade secrets or confidential information depending on the circumstances of the case. See Annot. 41 ALR 2d 15, § 115 (1955). Here, the plaintiff faced irreparable injury to its competitive advantage in the crash pad industry if the defendant had been permitted to continue to divulge to Sheller the techniques responsible for plaintiff's preeminence in the field. While on the other hand, defendant's right to earn a livelihood employing his general experience and skill in production of crash pads and related items has not been unreasonably restricted by the injunction. He is still free to consult on these items outside the United States for any of his former European employers, there being little doubt that his services are still much in demand.

Nonetheless, it is for the trial court to decide the nature and extent of the injunctive relief to which the plaintiff is entitled when confidential disclosure and violation are found. Sandlin v. Johnson, supra.

The judgment of the District Court is affirmed.