**BASSO CHEMICALS, INC., Plaintiff,**

v.

**William T. SCHMIDT and Ozark Chemical Company, Defendants.**

No. LR–C–81–519.

United States District Court,
E. D. Arkansas, W. D.

Sept. 22, 1981.

Philip S. Anderson, Wright, Lindsey & Jennings, Little Rock, Ark., for plaintiff.

James M. Simpson, Friday, Eldredge & Clark, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

WOODS, District Judge.

### PRELIMINARY STATEMENT

This is a diversity case brought by Basso Chemicals, Inc. a Florida corporation, against Ozark Chemical Company, an Arkansas corporation, and William T. Schmidt, an Arkansas resident presently employed by Ozark and formerly employed by Basso. Both Ozark and Basso are now engaged in the manufacture of defoaming agents, which are necessary for the production of pulp and paper products. Basso has been in this business for about ten years. It is not one of the major manufacturers of defoamers and operates principally in the southeastern part of the United States. It has no customers in the states contiguous to Arkansas, except for one in Texas. Basso has a major customer, Georgia-Pacific at Crossett, Arkansas, and one other small customer in Arkansas.

Ozark, which had principally been in the business of manufacturing cleaning solvents, decided to enter the defoaming field at the instigation of John A. Pinkston, who was hired by Ozark in May, 1980 as a marketing and production manager. Prior to his employment by Ozark, Pinkston had developed for Ozark a marketing plan, dated April 16, 1980, which entailed their manufacture of defoaming agents. (PX 1) He convinced Ozark's management that the plan was feasible, and in the summer of 1980 they decided to embark upon the manufacture of defoamers.

The execution of the plan required the employment of a formulating chemist with expertise in defoamers, and the name of William T. Schmidt was secured from an employment agency in New Jersey. Schmidt had been associated with the manufacture of defoamers at Drew Chemical Company and Diamond Shamrock, Co. since 1969. These two companies, particularly the latter, are preeminent in the field. Although Schmidt is not a graduate chemist, he has had some college training. At Drew and Diamond Shamrock in the formulation of defoamers, Schmidt was associated with some of the leading chemists, particularly Dr. Francis Boylan, who was the first to develop a process for hydrophobing silica—a significant breakthrough in the manufacture of defoamers.

During the latter term of his employment at Diamond Shamrock in New Jersey, Mr. Schmidt and his wife were legally separated and his wife went to Florida with their two children to live with her parents. A reconciliation ensued, and Mr. Schmidt felt it necessary to seek employment in the Florida area. He made application to several concerns and was eventually hired by Basso in April, 1980. At Basso Schmidt worked as a formulating chemist and had access to the formulas, processes and ingredients used by Basso. At the time of his employment, he signed an employment contract which provided in part that he would not (1) "disclose . . . any fact or facts concerning the secret formulas, processes, products or patents of Company"; (2) "engage in . . . within the territory in which Employee served as Company's chemist . . . any business which competes with the business of the Company," or (3) "render services to . . . any company . . . which competes with the business of Company." This restrictive covenant was to apply during Schmidt's employment and two years after its termination. Schmidt testified as to several reasons why he was not happy at Basso and was receptive to Ozark's invitation to come to Little Rock in August, 1980 and discuss employment as a formulating chemist. We think it is a fair inference that Schmidt went to Ozark because the latter offered him a salary in-

crease from $18,000 to $28,000 annually. Schmidt gave Basso his resignation in September, 1980 and went to work for Ozark on October 1, 1980. Shortly thereafter Schmidt began to formulate defoamers for Ozark, and the first commercial sale was shipped on Thanksgiving weekend of 1980. Defoamers now constitute 50–70% of Ozark's sales.

In its complaint Basso claims that Schmidt appropriated certain trade secrets which it used in the manufacturer of defoamers and made them available to Ozark. Basso further claims that Schmidt with the connivance of Ozark breached the above-mentioned employment contract. The nature of the trade secrets claimed by Basso are set forth in the findings of fact, *infra*.

Basso seeks a preliminary injunction enjoining Schmidt from continuing in the employment of Ozark, rendering service to anyone in Basso's trade area, and from violating his employment contract in any other manner. It seeks also to enjoin Schmidt and Ozark from divulging any of the trade secrets learned by him during his employment at Basso. An injunction is sought against Ozark to restrain it from manufacturing defoamers in reliance upon Basso's formulas and processes, and to require it to destroy all of its defoaming agents and deliver to Basso all documents, drawings and other matter relating to Basso's trade secrets, customer lists and confidential information. An accounting is demanded along with compensatory and punitive damages.

## FINDINGS OF FACT

1. Plaintiff is a Florida corporation with its principal place of business in the State of Florida; defendant William T. Schmidt ("Schmidt") is an Arkansas resident, and Ozark Chemical Company ("Ozark") is an Arkansas corporation with its principal place of business in Arkansas. An amount greater than Ten Thousand Dollars ($10,000.00) less interest and cost is in controversy between the parties.

2. Schmidt was employed by Basso commencing on or about April 14, 1980 as a chemist. In the course of his employment with Basso, Schmidt had access to formulas, processes and ingredients used by Basso in developing and producing defoaming agents, which it sold to the paper and pulp industry.

3. Basso customers were concentrated in the southeastern part of the United States. Basso had no customers in the states geographically contiguous to Arkansas, except for one customer in Texas. In Arkansas Basso had a substantial customer in Georgia-Pacific at Crossett, Arkansas. One-eighth to one-fourth of its gross revenue came from this customer. It sells a negligible amount of defoamer to one other customer.

4. Ozark has not approached Georgia-Pacific concerning sale of its defoamer and does not intend to make a contract with Georgia-Pacific within the next year. (Mr. Schmidt's restrictive covenant will expire at that time.)

5. As terms of his employment agreement with Basso, Schmidt agreed in writing, in a document signed on April 8, 1980, not to (1) "disclose . . . any fact or facts concerning the secret formulas, processes, products or patents of Company"; he further agreed not to (2) "engage in . . . within the territory in which Employee served as Company's Chemist . . . any business which competes with the business of the Company or (3) render services to . . . any company . . . which competes with the business of Company." This restrictive covenant was to apply during Schmidt's employment and two years after its termination. Such language would prevent Schmidt's employment in any state where Basso has customers or with any competitor in the defoaming business. Since Basso has only about 2% of the United States defoaming business and the other 98% is in the hands of its competitors, under the terms of the contract Schmidt signed, he would be effectively barred from employment in the area of his expertise with any company engaged in the manufacture of defoamers anywhere in the United States. We find such a sweeping restrictive covenant to be unreasonable.

6. Approximately one month after executing his Employment Agreement, Schmidt was contacted on behalf of Ozark and offered a job opportunity in formulating defoamers.

7. Schmidt indicated interest in the job opportunity and traveled to Arkansas in August of 1980. He met with several representatives of Ozark and discussed the nature and scope of his responsibilities.

8. The discussions covered the fact that defoamers would be formulated by Schmidt to be produced by Ozark. In mid-September, Schmidt returned to Little Rock and again visited Ozark, this time with his wife.

9. Schmidt told representatives of Ozark that he had an Employment Agreement with Basso under the terms of which he promised not to work for a company that competed with Basso, and Ozark's representatives told Schmidt that he did not have to worry about his contract because Arkansas was a "right-to-work" state.

10. Schmidt returned to Florida and advised Raymond P. Basso, president of Basso, that he was terminating his employment with Basso in order to go to work for a chemical company in Arkansas that made water treatment chemicals and corrosive inhibitors. He responded in the negative to Mr. Basso's inquiries concerning whether he was going to make defoamers for Ozark. He signed a statement at that time representing that he would not enter the business of making defoamers. That representation was false.

11. The ingredient Dow Corning 3011, which was used at times by both Basso and Ozark in manufacturing defoamers, was generally employed throughout the defoaming industry. This ingredient was a hydrophobic silica. Because of cost considerations, defoaming manufacturers sought to produce their own hydrophobic silica rather than to purchase it from other manufacturers. Basso contends that it was able to devise a system of producing hydrophobic silica that would result in a higher silica concentrate than Dow 3011 and was thus far more satisfactory. Basso contends that Schmidt learned this process from Basso and carried it over to Ozark. Defendants' expert testified that the process for producing higher silica concentrate was not unique and indeed was simple and widely known. The court finds that the production of hydrophobic silica by the method utilized by Basso was not a trade secret and that Schmidt, by virtue of his past experience at Drew Chemical and Diamond Shamrock, was acquainted with the essentials of this process, and indeed he testified he had used the Basso process at Diamond Shamrock. He undoubtedly acquired additional experience with the process in the short period of his employment with Basso, but the process was hardly a trade secret. It is also significant that he was closely associated with Dr. Francis Boylan at Drew Chemical. Dr. Boylan was the first to develop a method of hydrophobing silica, although admittedly his process differed from that used by Basso. It is also significant with respect to this finding that Mr. Raymond Basso admitted that his development of his hydrophobic silica process was almost completely dependent on a Dow Corning brochure describing its 3011 compound. This brochure was available to any and all on request.

12. Mr. Raymond Basso testified that he had developed an improvement in defoamers by the use of NIAX Polyol LHT–42. This ingredient is a polypropylene glycol made under the above brand name by Union Carbide. Similar compounds are manufactured by other companies and according to defendants' expert are widely used in the defoaming industry. Mr. Basso testified that he had discovered that LHT–42 would reduce the air content of wood fibers and that this was an improvement in the manufacture of defoamers. His testimony was vitiated to a considerable extent by his admission on cross examination that Betz Chemical had previously used LHT–42 in the manufacture of defoamers. At that time John Wombaugh, a chemist now with Basso had been a chemist with Betz. Schmidt testified that at Diamond Shamrock he had learned that LHT–42 was employed in the use of defoamers. Under these circumstances we find that the use of

NIAX Polyol LHT–42 in the manufacture of defoamers was not a trade secret entitled to protection of a court of equity.

13. In the last decade before the employment of Mr. Schmidt by Basso, both Schmidt and Basso began work on the formulation of defoamers. We find that in this period Mr. Schmidt accumulated as much expertise in this field as any of the Basso chemists. One of his duties at Diamond Shamrock was to analyze the defoamers made by Diamond Shamrock's competitors. Diamond Shamrock is the largest manufacturer is the field followed by Drew Chemical, Betz Laboratories, Nalco, Pioneer, Houghton, Callaway, Southern Sizing, and Hercules. Basso is not comparable in size to these manufacturers. It has about 6–8% of the market in the southeastern quadrant of the United States. At Drew Chemical he had the opportunity of working with Dr. Boylan, who is described as the foremost chemist in the field of defoamers. At Diamond Shamrock he patented a defoamer in concert with Ted Gammon, one of Diamond Shamrock's chemists. We therefore find that Schmidt was capable of formulating defoamers independent of any knowledge he may have gained during his six months at Basso.

14. Immediately upon employment by Ozark, Schmidt began formulating defoamers for production and sale. In their formulation he drew upon his ten-year experience in the industry and not to any substantial extent on knowledge gained while employed at Basso, although he did gain experience in formulation during the six-month period at Basso. The first commercial sale of defoamer was shipped by Ozark on Thanksgiving weekend of 1980. This tank car was shipped without prior testing. Basso argued that this indicated a complete appropriation of its formula. We are unwilling to draw such a sweeping inference. It could as well be argued that it simply demonstrated Schmidt's confidence in his ability to formulate a merchantable product.

15. Mr. Schmidt's primary motivation for leaving Basso was an increase in salary from $18,000 annually to $28,000 annually.

16. No customer of Ozark Chemical is a customer of Basso Chemical.

17. Ozark Chemical has not solicited sales from any customer of Basso since September, 1980.

18. The only trade secret learned by Schmidt at Basso was the use of PEG esters in the production of defoamers. Schmidt testified and we find that he has not utilized this trade secret at Ozark.

## CONCLUSIONS OF LAW

■ The court has jurisdiction of the parties and the subject matter of this lawsuit. Initially we must determine whether the law of Arkansas or that of Florida should be applied in this case. Since the contract in question was negotiated and executed by Florida residents and was to be performed in Florida, we hold that that state's law should govern. *Standard Leasing Corp. v. Schmidt Aviation*, 264 Ark. 851, 576 S.W.2d 181 (1979); R. Leflar, American Conflicts Law, §§ 144–150 (Bobbs-Merrill 1977). However, we also note that the law of Florida and the law of Arkansas are substantially the same in the interpretation of covenants not to compete.

■ Both Florida and Arkansas give a different effect to covenants not to compete where the property appropriated by the employee has achieved the status of a trade secret. For a comprehensive review of the history of this type of litigation, see Blake, *Employee Agreements Not to Compete*, 73 Harv.L.Rev. 625. For an excellent summation of the governing legal principles, see *Hulsenbusch v. Davidson Rubber Co.*, 344 F.2d 730 (8th Cir. 1965). "The issues of possession by plaintiff of trade secrets, confidential disclosure to defendant, and violation by him of that confidence or breach of his contract are largely factual . . . ." *Id.* at 734. In *Sandlin v. Johnson*, 141 F.2d 660 (1944), the Eighth Circuit has defined a trade secret as follows:

"A trade secret may consist of any formula, [process,] pattern, device or compilation of information which is used in

one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement, Torts, § 757, comment b. The discoverer's property right in a trade secret ceases prospectively to exist—except perhaps as against the continuing obligation of a contract, such as a licensing agreement—once the matter has become public property by a general disclosure on the part of the discoverer, or by a legitimate discovery and rightful general disclosure on the part of another. Cf. *American Dirigold Corp. v. Dirigold Metals Corp.*, 6 Cir., 125 F.2d 446, 452; *Godefroy Mfg. Co. v. Lady Lennox Co.*, Mo. App., 134 S.W.2d 140, 141. The fact, however, that another has legitimately discovered the trade secret will not permit one to whom a confidential disclosure has been made to violate the confidence, where the matter has not been generally disclosed by any of the discoverers, so as to have become public knowledge and property.

After reviewing the facts in this case, we do not feel that Basso's formula for manufacturing the defoamer used in the pulp and paper industry meets the criteria for a trade secret as set forth in *Sandlin, supra.* The defendant Schmidt and the defendants' expert testified that the ingredients of the formula were widely known and used as were the methods of manufacturing the defoamer. Further, the defendant Schmidt testified that when he went to work for Basso, he had nearly eleven years' experience in formulating defoamers. Indeed, he holds a patent for a defoamer. It is true that this patent covers a method different from that used by Basso and by Ozark, but it demonstrates Schmidt's expertise in the area of defoamers. Schmidt also testified that he had been exposed to the *in situ* method of hydrophobing silica while he was employed by the Diamond Shamrock Company. The plaintiff argues that use of Dow Corning 3011, NIAX LHT–42 and the proportions of the various other ingredients do constitute a trade secret. However, given the widespread knowledge of the ingredients and the easy access to methods for combining and producing the ingredients, we cannot conclude that Basso's formula deserves trade secret protection.

In support of its argument, the plaintiff has cited several Federal cases. *Hulsenbusch v. Davidson Rubber Co.*, 344 F.2d 730 (8th Cir., 1965); *Water Services, Inc. v. Tesco Chemicals, Inc.*, 410 F.2d 163 (5th Cir., 1969); *Harris Manufacturing Co. v. Williams*, 157 F.Supp. 779 (W.D.Ark., 1957).

In reviewing these cases and other authorities, two requirements for the enforcement of a covenant not to compete appear to be present. The first is that the secret to be protected be somewhat unique. We have already discussed the fact that the plaintiff's formula does not justify trade secret protection. The second is that the employee's work be somewhat innovative. As for Mr. Schmidt's work at Basso Chemical, we find that it was not particularly unique nor was it particularly innovative. Mr. Schmidt is a formulating chemist with some college hours and extensive experience in defoamers. During his five-month tenure at Basso, he both formulated defoamers and did quality control testing. However, there were no substantial changes made in the formula or in the method of manufacturing the formula. According to Mr. Schmidt, the type of ingredients and the manufacture of the ingredients were either known to him or easily discovered by him through sources other than Basso. His testimony was largely corroborated by the defendants' expert. These facts differ greatly from those present in the cases cited by the plaintiff. Almost without exception the employee in those cases had made a discovery or had substantially refined a technique while working for the plaintiff. By the exploitation of the trade secret, plaintiff had achieved preeminence in the field. Clearly a broad noncompetition clause is justified to prevent competition by an ex-employee whose techniques and discoveries were made possible through the funding of the employer. While Mr. Schmidt is a highly skilled employee, his work at Basso does not necessitate the deprivation of his livelihood within the broad

area encompassed by the covenant not to compete.

Given the preceding facts, we find the case of *Hydraulic Press Mfg. Co. v. Lake Erie Engineering Corp.*, 132 F.2d 403 (2d Cir., 1942) to be persuasive. There the defendant, a mechanical engineer who designed hydraulic presses went to work for a competitor even though he had agreed not to accept such employment within the United States. The court ruled that the clause was too broad and in doing so stated:

> Such a restriction as the plaintiff relies on is in derogation of the right of defendant Illing to practice his profession in earning his living wherever he can find work to do. In general no private employment contract which curtails that right will be enforced in a court of equity unless the rights of the employer reasonably need such protection.... Illing was in possession, of course, of such knowledge of the plaintiff's business as was necessary to enable him to work as a draftsman and do what designing was required on orders submitted to him, but he had none of the plaintiff's trade secrets to disclose to any competitor or to anyone else. His situation is not to be confused with that of a salesman whose acquaintance and personal relationships with customers of the plaintiff might enable him to divert their trade unfairly to a competitor.... Nor does his situation fall within other recognized exceptions to the general rule that when a man terminates one employment he may seek and take another wherever he can find it.... This plaintiff has been unable to prove that it had lost more than the continued services of Illing who was under no obligation to work for it for any definite time. It has proved no reasonable need for any protection under the restrictive covenant he signed. It has failed even to prove that Illing's services in any way differed from those ordinarily performed by a mechanical engineer who could be hired for $175 a month. It has, therefore, failed to prove any equity in the bill of complaint and it was properly dismissed on the merits. At 404.

*Hydraulic Press, supra* also sets forth the standard by which a covenant not to compete is to be judged. If such a covenant is to be upheld, it must be "reasonably necessary for the protection of plaintiff in its business...." 132 F.2d at 404.

Since we have concluded that the defoamer formula was not a trade secret, we feel that the restriction imposed upon Mr. Schmidt is far too broad. In essence it deprives Mr. Schmidt of the right to work in both the Southeastern and Southwestern sections of the United States even though Basso's customers are located primarily in the southeast. The covenant would accomplish such a draconian result, even though Mr. Schmidt worked for Basso for only five months. Under these circumstances we do not feel that the Florida law would uphold such a restriction. We, therefore, hold that the covenant not to compete should restrict Mr. Schmidt for a period of two years from working for any competitor of Basso Chemical located only within the southeastern United States.

We have concluded that Basso Chemical will not in all likelihood succeed on the merits. We also find that Basso Chemicals has not suffered and is not likely to suffer such irreparable harm that injunction would be appropriate. Furthermore, we find on balance that the harm to defendant Schmidt in losing the right to earn a living in the area of his expertise, along with the harm to defendant Ozark in losing its defoamer business, far outweighs any harm to the plaintiff. Accordingly, the plaintiff's motion for a preliminary injunction is hereby denied.