## TOULMIN, Jr., Plaintiff-Appellant, v. BECKER, Defendant-Appellee.

Ohio Appeals, Second District, Montgomery County

No. 2191. Decided February 1, 1954.

Pickrel, Schaeffer & Ebeling, Dayton, William H. Selva, of Counsel, for plaintiff-appellant.

Landis, Ferguson, Bieser & Greer, Dayton, Robert K. Landis, Jr., Charles S. Bridge, of Counsel, for defendant-appellee.

## OPINION

By MILLER, J.:

This is a law appeal from the judgment of the Common Pleas Court rendered in favor of the defendant-appellee, Walter Becker, who will be referred to hereafter as defendant, and the plaintiff, Harry A. Toulmin, as plaintiff.

The relief sought was an injunction restraining the defendant from violating the terms of his employment agreement with the plaintiff, who for many years has been engaged in the practice of patent law and patent soliciting under the firm name of Toulmin and Toulmin, with clients throughout the United States and many foreign countries. The case was submitted by stipulation upon the record made in the lower court and also upon additional testimony taken before a referee appointed by this Court. It was his conclusion that the injunctive relief should be denied and that the defendant should recover on his cross-petition for the sum of $1690.63, which amount was found to be due under the contract.

The plaintiff has filed exceptions to the referee's report, and has also moved that the same be modified or vacated, while the defendant seeks an affirmance of the same. The conclusions of the referee are fully set forth herein and are as follows:

### "FINDINGS OF FACT

"Said referee reports his Findings of Fact as follows:

"1. The original written contract between Toulmin and Becker reads as follows:

TOULMIN & TOULMIN
Attorneys at Law
Patent and Corporation Law
Dayton, Ohio

"Walter Becker, Esqr.,
214 West 92nd Street,
New York, N. Y. C.

"Dear Sir:

"This letter, when signed by you in duplicate, a copy for yourself and one for our files, will constitute the business arrangement incident to the position we have offered you, and you have accepted.

"1. Your compensation will be as follows:

(a) A drawing or salary account of $2400.00 per year. You may draw this salary monthly or weekly, as you may prefer. This salary covers your work as a patent solicitor in amending cases, United States and foreign, passing on preliminary examination reports, interviewing the Patent Office Examiners on amending of cases, etc. We work from eight to twelve

and one to five on week days and eight to twelve on Saturdays.

(b) A commission of 10% of our personal fee for preparing the specifications and claims constituting an application ready to be filed in the Patent Office. This refers to United States patent applications. Whatever accumulates to your credit on this basis during, say, the month, will be added to your monthly salary check.

(c) A per diem of $10.00 a day, and in proportion to parts of days, based on the office hours of 8:00 A. M. to 5:00 P. M. for Monday through Friday and 8:00 A. M. to 12:00 noon on Saturday (making a 44-hour week) for such work as we may assign to you to do, other than what may be called patent-soliciting work. The per diem rate applies to those matters on which we charge a per diem rate to the client such as validity and infringement opinions, litigation, arguments before various tribunals, and the like. This per diem is in addition to the other compensations above mentioned, and will be paid as and when we are ourselves paid our charge or per diem for such work.

(d) As further compensation, a commission of 5% of our personal fee will be paid to you for all amendments prepared by you, both United States and foreign. This will be paid as and when we are ourselves paid our charge for such work.

(e) As further compensation you will be entitled to a yearly vacation of two weeks during the summer period, during which you will be entitled to your drawing account just the same as if you were not on vacation, so the vacation will not operate to curtail in any manner the drawing account.

(f) You will further agree that, in order not to seem to compete with any clients or their employees, any invention which you may think of applicable to any client's business will be turned over to that client gratuitously, your compensation from this firm being your compensation for so doing.

"2. In consideration of the confidential and professional relations you will have with us, and the intimate knowledge you will acquire with respect to our clients, and the manner in which we conduct our practice, you, by accepting this position, agree not to go into the practice of patent law or patent soliciting, directly or indirectly, as a practitioner or an employee, in the event your relations with us are severed, whether by you or by us, or by mutual consent, in the States of Ohio and/or Michigan within a period of five (5) years, ensuing from the severance of your relations with us; and agree not to deal with any of our clients that we have while you are with us at any time, or after you leave us. Any client that comes to you while employed by us will become clients of this firm.

This provision does not mean that we think you would make any improper use of your knowledge of our affairs, but is a provision the other lawyers here in the office have all assented to as an act of goodwill on their part.

We understand that you wish to start with us on November 20th, 1939, which is agreeable to us. Your acceptance will indicate when you will so start. and we will hold the position open for you.

We look forward with great pleasure to having you associated with us over a long period of years and to join the others here who have been with us many years.

Very truly yours,

(s)  TOULMIN & TOULMIN

I hereby accept and agree to the terms and conditions as set forth in the above letter and will enter upon my relationship with you accordingly on the 20th day of November, 1939, in consideration of your holding the position for me until that date.

(s)  WALTER BECKER

Dated the 4th day of November, 1939.

"2. Subsequently, Toulmin wrote letters to Becker, advising him of increases in his compensation, which, since July 30, 1948, was to be $5,000 per year for his base salary (described as 'Drawing or Salary Account') in 1 (a) of the original contract; 15% on new patent applications in 1 (b) of the original contract; and 20% on amendments in 1 (d) of the original contract.

"3. In addition to the compensation set forth in the original written contract and the subsequent letters of Toulmin to Becker, Becker was paid commissions on other work done by him, such as on copyrights, trade-marks, foreign patent applications and annuities. This additional compensation was allowed by Mrs. Arthur Knowles, who had complete authority for and was in charge of the computation of compensation due Becker. She was the Executive Secretary of Toulmin.

"4. The contract of Becker's employment was terminated by Becker resigning and Toulmin accepting his resignation on May 11, 1951.

"5. Becker was not, and is not, a patent attorney. He has never been admitted to the bar.

"6. On May 11, 1951, Becker wrote a Mr. Oedekoven, a German patent agent who was an old friend of Becker, for whom Toulmin, through Becker, had been performing services, telling him of the termination of his employment with Toulmin and that he, Becker, was opening an office of his own and that he would handle U. S. Patent applications to be filed in Washington 'on behalf of German correspondent attorneys.' Similar

letters were written to other German patent agents, a number of whom were old personal friends of Becker, and for whom he had handled matters for Toulmin while in Toulmin's employ. Shortly thereafter, he sent letters to a number of other foreign patent agents with whom he had had dealings while in Toulmin's employ, advising them that he had set up his own office and soliciting their business. Several weeks later, a client of one of these foreign agents revoked his powers of attorney previously granted to Toulmin and gave similar powers of attorney to Becker. Becker also wrote a letter to The Dayton Rubber Company as to his availability for handling foreign patent applications for that company, which had formerly been a client of Toulmin. This letter was sent to The Dayton Rubber Company's patent attorney, who was then handling that company's patent matters, rather than Toulmin.

"7. The 'patent soliciting' that Becker, since the termination of his employment, has done, or threatens to do, has not and will not result in great damage or cause great or irreparable injury to Toulmin.

"8. Toulmin's total professional business grossed between $400,000 and $700,000 annually in recent years and his net income therefrom has averaged $100,000 or more. Sixty per cent of his gross income was from patent work and forty per cent from corporate legal practice. There is no testimony as to the exact value of his foreign patent work, but it was of comparatively small value to Toulmin.

"9. If Becker is entitled to the contractual rate of commission, on amendments prepared for U. S. clients to be filed abroad, on the whole of the Toulmin's bill to such U. S. clients, there is still due and unpaid to Becker the sum of $657.24 There is also due and unpaid to Becker a net amount of $1,033.39, assuming that all of Toulmin's invoices covering work done by Becker are paid by Toulmin's clients, which was agreed to by counsel for Toulmin.

## "CONCLUSIONS OF LAW

"Said Referee reports his conclusions of law as follows:

"1. There was a valid, oral amendment to the written contract of employment by the parties accepting and acting upon the allowance and payment of additional compensation to Becker for work done by him on copyrights, trademarks, foreign patent applications and annuities.

"2. Becker has not engaged in the practice of patent law, as forbidden by the contract. Becker, since the termination of his employment, has sought business as a 'patent solicitor.' He has not sought such business in Ohio or Michigan (although he has continued to reside in Ohio), but he has sought

such business solely from foreign countries, with one exception, i. e., from The Dayton Rubber Company, in one instance.

"3. The German and other foreign patent solicitors, or agents, were not 'clients' of Toulmin.

"4. 'Our fee' in the employment contract includes the charge added to bills for Toulmin's services.

"5. The terms of the employment contract are not clear and unambiguous as to the restrictive provisions, and their violation has not been clearly shown; neither has it been shown by Toulmin that these restrictive provisions are clearly reasonable.

"6. There is still due from Toulmin and unpaid to Becker the sum of $657.24 for Becker's contract commissions on Toulmin's bills which included an added charge for Toulmin's personal services. There is also due Becker, and not paid, the sum of $1,033.39 for Becker's work on matters for which, formerly, Toulmin had not been paid by his clients.

### "CONCLUSION

"In view of the foregoing Findings of Fact and Conclusions of Law, the Referee is of the opinion that the prayed for injunction should not be granted and that Becker should recover from Toulmin the sum of $1,690.63 and the costs of this suit.

(Signed)     Alfred Swift Frank<br>Referee

September 30, 1953."

The plaintiff first urges that the referee failed to include and consider certain admitted and uncontradicted facts which materially affected his legal conclusions. We have given this assignment careful consideration and are of the opinion that the additional facts set forth in the plaintiff's exceptions are evidential in character and not in conflict with the ultimate facts as found by the referee.

The plaintiff next urges that the referee erred in his legal conclusion No. 3, which is: "The German and other foreign patent solicitors, or agents, were not 'clients' of Toulmin." This conclusion is of no consequence, for as will be later explained, we think the restrictions relating to the plaintiff's clients are illegal and void. However, should we be wrong in this conclusion, we would be compelled to agree with the referee and will state our reasons for so doing: First, in the interpretation of any contract the language must be construed strictly against the person who used it who, in this case, is the plaintiff. See 9 **O. Jur.** 429 and 430. Second, this contract is in restraint of trade, which is not looked upon with favor and must be "strictly construed and enforced only in

clear cases where material damage to the plaintiff is apparent and no irrevocable hardship will result to the defendant and others." **9 O. Jur. 432, Sec. 203.**

It appears that these foreign patent agents or solicitors were not acting as principals in their dealings with plaintiff, but merely as agent of the person or legal entity seeking the patent. It will be noted that their title alone indicates that they are acting as "agents." A "client" in the usual sense of the word is the one who needs professional help and who ultimately pays for the same. The term is defined in Webster's New International Dictionary (2d Ed.) as:

"One who employs the services of any professional or business man as a customer; also loosely a patron or customer of any business establishment, shop, store or the like."

In Bouvier's Law Dictionary we find the term defined as:

"One who employs and retains an attorney or counselor to manage or defend a suit or action to which he is a party, or to advise him about some legal matter."

A like definition is found in Black's Law Dictionary, Third Edition.

In Haden v. Lovett, 65 S. E. 853, decided by the Supreme Court of Georgia, an interpretation of the term "client" arose between two attorneys, one being employed to recover certain property on a 50% fee basis. The first attorney employed a second one to assist him, and agreed to pay him his fee. The first lawyer collected the fee from his client but refused to pay the second, who attempted to recover under the Georgia Civil Code of 1895, Section 4416, which provided as follows:

"Where attorneys retain in their hands the money of their clients after it has been demanded, they are liable to rule (and otherwise) as sheriffs are, and incur the same penalties and consequences."

The Court here said:

"It was never intended that the word 'client' as used in this section should embrace one attorney who employed another to assist him in rendering services in litigation in which the former was no party and was only interested by reason of his having a fee in such case contingent upon his winning it. The section is penal in its nature, and must be strictly construed."

We therefore conclude the foreign agents or patent attorneys contacted by the defendant after the termination of his employment were not clients of the plaintiff.

The third specification of the plaintiff's exceptions is directed to the referee's finding that "patent soliciting" is not

forbidden by the contract as found in the second conclusion of law. Our interpretation of this conclusion is not in accord with that of the plaintiff, for we do not think that the referee has so decided. He merely makes the determination that the defendant has not engaged in the practice of patent law, but that in several instances he had sought business as a "patent solicitor." Such solicitation is clearly included in acts attempted to be prohibited by the contract.

The next exception is taken to the 5th conclusion of law, which is:

"The terms of the employment contract are not clear and unambiguous as to the restrictive provisions, and their violation has not been clearly shown; neither has it been shown by Toulmin that these restrictive provisions are clearly reasonable."

We agree with the exceptor in this instance as to some of the findings set forth in this specification. It will be noted first that the restrictive covenant is divisible, the first part having application only to the states of Ohio and Michigan, and the other, to clients of the plaintiff wherever they may be situated. The first part we hold to be valid and enforceable, and the other to be ambiguous, unreasonable, illegal and in restraint of trade. **Lange v. Werk, 2 Oh St 519, 531; Thomas v. Miles, Admr. of Miles, 3 Oh St 274; 17 C. J. S. 676, and cases cited in the footnote; Briggs v. Butler, 140 Oh St 499.** The first part of the covenant forbids the defendant "to go into the practice of * * * patent soliciting, directly or indirectly as a practitioner * * * in the State of Ohio and/or Michigan within a period of five years." When the defendant opened offices in Dayton, Ohio, for the sole purpose of patent solicitation, he committed a substantial breach of the covenant for which plaintiff is entitled to complete injunctive relief. The defendant holds himself out and advertised himself in directories of the City of Dayton, as a patent solicitor. It is not enough for the defendant to say that he will not solicit clients in Ohio or Michigan but limit his solicitation to the territory outside these two states. The opening of an office for the purpose of conducting the business of patent solicitation in the designated territory is forbidden by the covenant, regardless of the residence of the prospective clients. The practice of patent solicitation involves the rendering of services to local clients who have business elsewhere, and to clients who reside beyond the boundaries of the States of Ohio and Michigan in which local services would be required. The Ohio law with respect to such covenants is quite lengthily discussed in the case of **Briggs v. Butler, 140 Oh St 499,** the syllabus of which provides:

"1. A contract between an employer and employee whereby the latter agrees that subsequent to the termination of such employment he will not engage in a competitive business within in a reasonably limited time and space is valid and enforceable where the restraint is not beyond that reasonably necessary for the protection of the employer's business, is not unreasonably restrictive upon the rights of the employee and does not contravene public policy.

"2. A contract between an employer and employee may not unduly restrict the activities of the employee subsequent to the termination of the employment or limit the same to a greater extent than is reasonably necessary for the protection of the business of the employer, and the determination of such necessity is dependent upon the nature and extent of the business and the nature and extent of the service of the employee in connection therewith and other pertinent conditions.

"3. Where the contract involved is one for personal service in advertising and solicitation of patronage and the restrictive provisions thereof relate only to the 'same kind or similar business, in competition with' the employer and do not undertake to otherwise restrict or limit the trade, occupation, profession, business or activities of the employee, the contract is not unreasonably restrictive upon the rights of the employee and does not thereby contravene public policy."

The referee made no factual finding of the territories in which the plaintiff practiced his profession; hence, we may look to the record for this information. In so doing we find that his firm has been engaged in this type of business for more than half a century with a very large part of the same coming from Ohio and Michigan, and the remainder of his business coming from the other states as well as many foreign countries. For the latter, a special department was set up in his office of which the defendant was the head. In giving consideration to these facts it would appear that the restrictions applicable to the states of Ohio and Michigan for a period of five years is reasonably necessary for the protection of the plaintiff's business and is not unreasonably restrictive upon the rights of the defendant. He still has the remaining states and territories of the United States as well as the remainder of the world for the practice of his profession. This would constitute only a limited restraint of trade and would not be in contravention of public policy.

The covenant was reasonable as to time and space and when measured by the nature of plaintiff's practice and adequate protection to be afforded, the requirements are not unreasonable.

The defendant cites the case of **Gates-McDonald Co. v. McQuillan, 33 Abs 481,** but which we find is distinguishable on the facts from those relating to the first part of the covenant, and which distinction was well pointed out by Judge Beery of the trial court.

In considering Part 2 of the covenant it will be noted that there is no restriction as to the time during which he will not deal with any of the plaintiff's clients. In other words, it would be applicable during the entire lifetime of the defendant. And since this is indefinite as to time we cannot say that it is reasonable. In the case of **Kex Mfg. Co. v. Plu-Gum Co., 28 Oh Ap 514,** Judge Vickery at page 519 well states the rule with reference to the time limitation in such covenants when he says:

"In other words, the contracts have been sustained when it was necessary to do so to preserve the business which was sold, and, if that covered a broader area than a local trade, a contract for that purpose for a reasonable time would be upheld, but no contract has been upheld where it is for all time, or where the time is so unreasonably long that it would necessarily forever prohibit the vendor from engaging in a like business."

This part is also ambiguous for it does not specify the time the status of a "client" relationship shall be determined. It is a matter of common knowledge that such a relationship is not static but is subject to constant change, such as the loss of old clients and the acquiring of new ones.

We therefore hold Part 2 of the covenant to be ambiguous, unreasonable, illegal and void.

In giving consideration to the cross-petition of the defendant we find that the defendant deliberately violated the restrictive covenant relating to engaging in the practice in the states of Ohio and Michigan and committed substantial breach of the same and for which equity will not permit a recovery. The plaintiff's motion to modify the conclusion of the referee will be sustained in accordance with this opinion, and the defendant's motion to confirm will, with the aforesaid modifications, also be sustained. The plaintiff will be granted a permanent injunction against the defendant preventing him from conducting his patent business in Ohio and Michigan and/or from soliciting clients in Ohio or Michigan, for a period of five years from the termination date of employment, to-wit: May 11, 1951.

Judgment will also be rendered for the plaintiff on the cross-petition and for costs of suit.

WISEMAN, PJ, HORNBECK, J, concur.

**TOULMIN, Jr., Plaintiff-Appellant, v. BECKER, Defendant-Appellee.**

No. 2191. Decided March 29, 1954.

**OPINION**

By THE COURT:

Submitted on motion of defendant for an order requiring plaintiff to increase his bond to an amount adequate to secure to the defendant the damages he may sustain if it be finally decided that the injunction ought not to have been granted. Plaintiff filed an action to enjoin the defendant from violating a restrictive covenant in a contract of employment. The defendant cross-petitioned, claiming an amount due him as commission under the employment contract. The Court granted a temporary restraining order and fixed plaintiff's bond at $2,500.00, which was afterwards increased to $5,000.00. The judgment of the Common Pleas Court denied any relief to the plaintiff or the defendant, and dissolved the temporary restraining order.

Plaintiff appealed to this Court on questions of law and fact. Plaintiff posted an appeal bond in the amount of $200.00. While the action was pending before the referee appointed by this Court both parties were ordered to and each posted cost bond in the amount of $1,500.00. This Court rendered judgment in favor of plaintiff, and granted a permanent injunction against the defendant from engaging in business in Ohio or Michigan, and dismissed defendant's cross-petition.

The motion of defendant for an order to increase the bond is directed to the appeal bond in the amount of $200.00 posted by plaintiff at the time he gave notice of his intention to appeal on questions of law and fact. An order increasing the bond may have been proper pending the hearing and final disposition of the case in this Court, but the fact is that defendant was not temporarily restrained by an order of this Court while the matter was pending. Now this Court has rendered final judgment in favor of the plaintiff. The defendant contends that he should have protection while this matter is pending on appeal to the Supreme Court. This Court has granted a permanent injunction to the plaintiff. If defendant appeals from this order to the Supreme Court, and desires protection against the enforcement of the order of this Court, he will be required to file a stay bond. Under the state of the record plaintiff is not required to give bond to protect the defendant.

Motion overruled.

WISEMAN, PJ, MILLER and HORNBECK, JJ, concur.