Spencer FALCON, M.D., Individually and on behalf of his patients, Appellant,

v.

ALASKA PUBLIC OFFICES COMMISSION, Appellee.

No. 3220.

Supreme Court of Alaska.

Oct. 21, 1977.

Stephanie J. Cole, John S. Hedland, Rice, Hoppner & Hedland, Anchorage, for appellant.

Rodger W. Pegues, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, RABINOWITZ, CONNOR, BURKE and MATTHEWS, Justices.

## OPINION

BOOCHEVER, Chief Justice.

Like many other states,[1] Alaska has recently enacted legislation requiring disclosure of the financial interests of public officials and candidates for office. In this case, we consider the applicability and constitutionality of certain provisions of that law, AS 39.50.010, *et seq.*, which has been entitled the Alaska Conflict of Interest law.

Dr. Falcon has appealed from a decision on summary judgment that, as a member of the Kodiak Island School Board, he is required by statute to disclose the names of all patients from or on behalf of whom his professional corporation has received over $100.00 in income during calendar year 1974. He raises three issues:

1. Does AS 39.50.200(8), which defines "source of income" as the *clients* or *customers* of a professional corporation, require disclosure of the names of individual patients of physicians employed by and holding an interest in such corporations?

2. Is a physician exempted from compliance with AS 39.50 on the grounds that disclosure of a patient's identity violates the legal privilege between physician and patient or is barred by the ethical considerations attendant on the physician-patient relationship?

3. Does the disclosure of the names of individual patients unconstitutionally invade each patient's right to privacy?

Like the superior court, we find that the statute does require disclosure in the in-

---

1. *See, e. g.,* Ark.Stat.Ann. 12–3001–12–3008; Cal. Gov't Code §§ 3600 *et seq.;* Ill.Stat. ch. 127, §§ 601–101 *et seq.;* Kansas Stat.Ann. §§ 75–4301–75–4306; Tenn.Code Ann. §§ 8–4125–8–4129; Rev.Code Wash. ch. 42.17; W.Va.Ann.Code ch. 63.

stant situation and that such disclosure is not barred by a legal privilege or ethical mandate. We conclude, however, that in the absence of applicable regulations designed to protect certain classes of patients, the Conflict of Interest law impermissibly infringes on a constitutionally-protected zone of privacy.

The central facts of the case are not disputed. Spencer Falcon is a physician licensed under the laws of Alaska to practice medicine. He is actively engaged in practice and maintains an office in Kodiak, Alaska.

During the calendar year 1974, Dr. Falcon was a one-third owner of the Kodiak Island Medical Center, a professional corporation organized under the laws of Alaska. During this time, he derived no income from the practice of medicine except from his interest in the Kodiak Island Medical Center. Payment is made to the Center for services by its physicians.

Dr. Falcon's practice consists primarily of general medicine. Approximately three to five percent of his time and income relates to psychiatric counselling; approximately two to four percent is concerned with treatment of all varieties of venereal disease and approximately twenty percent of the practice of the corporation involves contraception.

On November 24, 1975, Dr. Falcon was duly appointed a member of the Kodiak Island School Board to fill the unexpired term of a resigning member. As a result of this appointment, he submitted a "Conflict of Interest Statement for Public Official or Candidate" to the Alaska Public Offices Commission (APOC) on a form prescribed by APOC. Although disclosing various data required by the provisions of the Alaska Conflict of Interest law, AS 39.50,[2] Dr. Falcon did not reveal the names of individual patients from whom the Kodiak Island Medical Center had received over $100.00 in income during the 1974 calendar year.

On December 26, 1975, acting under color of the Conflict of Interest law, the APOC notified the Borough Clerk of the Kodiak Island Borough that Dr. Falcon's statement was deficient under AS 39.50.030(b)(1) and AS 39.50.200(8).[3] Dr. Falcon refused to make the disclosures. The Attorney General agreed not to prosecute for nondisclosure if Dr. Falcon would initiate a test case with reasonable diligence.

A suit for declaratory judgment was commenced in February 1976. As there were no disputed issues of material fact, both parties moved for summary judgment on the issues of the applicability and constitutionality of AS 39.50.

After oral argument, the trial court ruled in favor of the APOC. It found that "physicians are no less prone to have possible conflicts of interest than are businessmen . . . .," and that they are clearly included within the class that must report the names of clients. The court further found no stat-

---

2. AS 39.50.030 provides in pertinent part:

*Contents of statements.* (a) Each statement shall be an accurate representation of the financial affairs of the public official or candidate and shall contain the same information for each member of his family, as specified in (b) of this section, to the extent that it is ascertainable by the public official or candidate. An asset or liability under $500, household goods, and personal effects need not be identified.

(b) Each statement filed by a public official or candidate under this chapter shall include:

(1) the source of all income over $100, including capital gains, whether or not taxable, received by him or his spouse or dependent child of his or nondependent child of his who is living with him, during the preceding calendar year; . . . . .

3. AS 39.50.200(8) states:

"source of income" means the entity for which service is performed or which is otherwise the origin of payment; if the person whose income is being reported is employed by another, his employer is the source of his income; but if he is self-employed by means of a sole proprietorship, partnership, professional corporation, or a corporation in which he or his spouse or his children, or a combination of them, hold a controlling interest, the "source" is the client or customer of the proprietorship, partnership or corporation, but if the entity which is the origin of payment is not the same as the client or customer for whom the service is performed, both are considered the source;

utory or common law privilege sufficient to excuse a physician from revealing the names of his patients. Finally, having determined that Dr. Falcon had standing to raise the argument that disclosure of his patients' names would unlawfully invade their rights to privacy, the trial court concluded that the statute mandating intrusion into the patients' privacy constituted a "close and substantial means of accomplishing the over-all purpose of the statute" and was therefore constitutional.

This appeal followed.

## I

We first address Dr. Falcon's contention that the patients of a physician are not "clients" or "customers" and therefore do not fall within the scope of the statute. AS 39.50.030 requires that public officials and candidates reveal, among other data, "the source of all income over $100." "Source of income" is defined in AS 39.50.200(8) as:

. . . [T]he entity for which service is performed or which is otherwise the origin of payment; if the person is self-employed by means of . . . a professional corporation . . ., the *"source" is the client or customer of the* . . . *corporation* . . . . (emphasis added)

The Conflict of Interest law was enacted in 1974 by popular initiative. There is therefore a relative dearth of legislative history to aid in determining the meaning of the statutory language.[4] In the past, this court has eschewed speculation on the intent of the voters who approved a particular ballot measure;[5] and, in any event, there appear to be no published arguments made in connection with the vote[6] which would give some indication of the precise meaning of the chosen language.

■ Nevertheless, we have little difficulty concluding that a patient of a physician is a client for medical services and falls within the scope of the statute. Our view is supported by the definitions in Webster's Second International Dictionary,[7] and these and similar definitions have been relied upon by a number of courts in somewhat different contexts.[8] It may be true that in the past the terminology ordinarily associated with the medical profession on one hand and business on the other has been distinct. With the burgeoning of "professional corporations," however, medicine has taken on more of the attributes of the business world, and the language of business has followed. Indeed, in a letter to Dr. Falcon, the director of the Kodiak Island Medical Center refers to the Center's patients as "clients" and "clientele."[9]

---

**4.** HB 855, introduced in 1976, would have amended AS 39.50.200(8) to add the term "patient" to "client or customer." Dr. Falcon urges the court to interpret the fact that the bill did not pass as an indication that the legislature did not regard the statute as providing for disclosure of their names and did not intend it to do so. There appears to be no clear rule regarding the weight to be accorded subsequent amendments which are not enacted into law. *See* 2 Sutherland, Statutory Construction § 5110 at 526–28 (3d ed. 1943). However, since there is no recorded history on this matter and the legislature may reject a proposal for a number of reasons, we find this argument unpersuasive. ·

**5.** *See Starr v. Hagglund,* 374 P.2d 316, 321 (Alaska 1962).

**6.** "In determining the meaning of legislation enacted through initiative, or referendum, the courts will look to the published arguments made in connection with the vote upon such measures." 2 Sutherland, Statutory Construc-

tion § 5016 at 507 (3d ed. 1943). *See State v. Lewis,* 559 P.2d 630, 637–38 (Alaska 1977), where we relied on the published Report to the People of Alaska from the Alaskan Constitutional Convention to ascertain the intent of the drafters and those who voted for ratification of the Constitution.

**7.** A "client" is defined as:
4. a. One who employs the services of any professional or business. . . .
b. One served by, or utilizing the services of a social agency or institution . . ., a patient or case.
Webster's Second International Dictionary at 502.

**8.** *See, e. g., Di Silvestri v. Golden Crest Motel Corp.,* 148 Conn. 121, 167 A.2d 857, 859 (1961); *Toulmin v. Becker,* 124 N.E.2d 778, 784 (Ohio App.1954).

**9.** "Clientele" is defined in Webster's as:
2. A body of clients; . . . .

This construction of AS 39.50.200(8) comports with the stated statutory policy. Although the relationship between physicians and their patients ordinarily presents less danger of a conflict of interest than the connection between businessperson and client, the purpose of the statute is to bring to light all conflicts—actual and potential. AS 39.50.010 states:

> *Findings and purpose.* (a) It is declared by the people of the State of Alaska that the purposes of this chapter are:
>
> (1) to discourage public officials from acting upon a private or business interest in the performance of a public duty;
>
> (2) to assure that public officials in their official acts are free of the influence of undisclosed private or business interests;
>
> (3) to develop public confidence in persons seeking or holding public office, enhance the dignity of the offices and make them attractive to citizens who are motivated to public service; and
>
> (4) to develop accountability in government by permitting public access to information necessary to judge the credentials and performance of those who seek and hold public office.

Once all sources of income are revealed, the public may ascertain whether, in fact, a conflict is "spurious" or significant. A judgment as to the types of conflicts which ought to evoke concern is neither within the province of the courts [10] nor the public officials whose conduct is monitored for the purpose of maintaining public confidence in the democratic process.

## II

Having determined that the statute encompasses individual patients as sources of income, we next consider whether disclosure is barred in this situation because of a legal privilege or ethical obligation. AS 39.50.035 states:

> No person subject to this chapter is exempt from any of its provisions *except to the extent state courts determine that legally privileged professional relationships preclude complete compliance.* (emphasis added)

■ We have defined the physician-patient privilege in Civil Rule 43(h)(4) as follows:

> *Physician-Patient Privilege.* A physician or surgeon shall not, against the objection of his patient, be examined in a civil action or proceeding as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient.

Thus, under the rule, the privilege applies only to information acquired by the physician which is necessary for him to act for the patient.

Conceding that the evidentiary privilege does not ordinarily protect the identity of the patient,[11] Dr. Falcon argues that statutory provisions subjecting him to discipline for unethical conduct creates a legal privilege barring disclosure in this situation.

■ The ethical responsibilities of a physician to his patient, like those of a lawyer to his client, are indeed broader than the limited evidentiary privilege;[12] and the

3. Those who habitually adhere or resort to a person, as a lawyer *or doctor* for professional advice. . . . (emphasis added)

10. *Cf. Illinois State Employees Ass'n v. Walker*, 57 Ill.2d 512, 315 N.E.2d 9 (1974):

Whether a particular disclosure is necessary to accomplish the purposes of the executive order is primarily a matter for the executive branch to determine.

11. The name of the patient is rarely information which is necessary for treatment. *Cf. Chamberlin v. Missouri Elections Commission*, 540 S.W.2d 876 (Mo.1976) (identity of client not ordinarily within scope of privilege), discussed *infra; Baird v. Koerner*, 279 F.2d 623 (9th Cir. 1960), where the court, recognizing that in certain circumstances the identity of a client is protected by the attorney-client privilege, stated that the issue must be resolved on a case-by-case basis. Unlike the situation in *Baird,* no specific showing or argument regarding a specific client has been made here.

12. *Cf. Allred v. State,* 554 P.2d 411, 416 (Alaska 1976). Writing for the court, Justice Connor rejected the contention that AS 08.86.200 created an evidentiary privilege for psychotherapists. He noted, however, that the statute was probably enacted as an "anti-gossip" measure which might provide the basis for professional

legislature, in providing for discipline, has delegated the formulation of those responsibilities to the profession.[13] Thus, as a physician, Dr. Falcon may be subject to loss of license, censure or reprimand for violating the State Medical Association declaration that publication of patients' names by board members in complying with AS 39.50 is unethical.[14] However, the possibility of professional discipline for unethical behavior is irrelevant to the instant case. The statutory exemption applies only to legal privileges, not ethical mandates. Moreover, to equate ethical directives with legal privilege for purposes of AS 39.50, particularly where, as here, a relevant professional standard has been enacted subsequent to the passage of the Conflict of Interest law, would effectively allow an elite professional group to amend the law by declaring itself exempt. We conclude, therefore, that there is no legal privilege which precludes compliance with the Conflict of Interest law.

### III

The final and most significant issue in this appeal is whether AS 39.50 impermissibly infringes on the right to privacy of the individual patients of a physician.

█ Since Dr. Falcon concedes that but for the interests of his patients, the public would be entitled to know of any information which could reveal possible conflicts of interest in the performance of his official duties, he has to that extent waived his right to privacy by "voluntarily entering the public arena." [15] As he claims an invasion of privacy only on behalf of his patients, we must initially consider his standing to assert the constitutional rights of third parties.

█ The question of standing involves a determination that there exists the "adversity which is fundamental to judicial proceedings" and is necessary for a fair resolution of the case before us.[16] Standing is a component of justiciability which, under the federal constitution, acts as a limitation on federal court jurisdiction, and is grounded in the "case or controversy" requirement of art. III. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Under

discipline or a civil suit loosely based on privacy notions.

**13.** AS 08.64.330(b) states:
A license may be revoked for unprofessional or dishonorable conduct as defined in § 380(3) of this chapter, or for professional incompetence.
AS 08.64.380(3) provides in part:
"unprofessional or dishonorable conduct" means:
(g) violating the principles of medical ethics of the American Medical Association and of the Alaska State Medical Association.

**14.** The trial court found that on January 4, 1975, the Alaska State Medical Association Council declared that publication of patients' names by State Medical Board members in complying with AS 39.50 is unethical. It concluded, however, that since the action of the Medical Association was made for the purpose of explaining the resignation of the physicians from the State Medical Board, it could only inferentially apply to physicians who have made themselves available to serve on school boards, in the legislature and other offices for which being a physician is not a prerequisite. In our view, the fact that a physician is subject to professional discipline for revealing the names of patients does not create a "legal privilege" within the meaning of AS 39.50.050.

Therefore, we need not determine whether the declaration of the Medical Association Council is in fact directly applicable to Dr. Falcon.

**15.** *Cf. New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), as to the right to criticize official conduct of public officers. *But see,* Advisory Opinion on Constitutionality of 1975 PA 227, 396 Mich. 465, 242 N.W.2d 3, 19 (Mich.1976):

We reject the notion that an individual's entry into the governmental arena waives the right to privacy. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), insures the public an opportunity to make nonmalicious criticisms of a public official's official conduct. Those seeking public office are well advised to recall the words of Harry S. Truman:

'If you can't stand the heat, stay out of the kitchen.!' Public officials must recognize their official capacities often expose their private lives to public scrutiny. However, we see a great difference between 'unavoidable exposure' and 'compelled disclosure.' We reject any notion that the *Sullivan* case can be read to require public officials to fuel the fire of those who seek to roast them.

**16.** *Moore v. State,* 553 P.2d 8, 23 (Alaska 1976).

*Flast,* the federal constitutional standards of "case or controversy" require adversity and concreteness in order to ensure than "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."[17] Since the requirement of adversity is neither federally mandated nor required by the Alaska Constitution, the court's requirement of adversity as a component of standing is essentially a judicial rule of self-restraint.[18] The court in *Wagstaff v. Superior Court, Family Division,* 535 P.2d 1220, 1225 (Alaska 1975), adopted the "injury-in-fact" test to determine the requisite adversity.

■ Although one United States District Court has denied a physician standing under analogous circumstances,[19] we conclude that Dr. Falcon may challenge the constitutionality of the Conflict of Interest law on behalf of his patients. There are two reasons for this determination. First is our conclusion that Dr. Falcon's patients, in attempting to vindicate their rights, would forfeit the very privacy they seek to protect.[20] *See Carey v. Population Services International,* 431 U.S. 678, 684 n. 4, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). In *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the standing to raise members' rights of association was granted to the NAACP in part because the members' rights could not be effectively vindicated if the members were required to step forward and litigate.

■ The second basis for our determination that Dr. Falcon may challenge the constitutionality of the law on behalf of his patients is our finding of adversity on the part of Dr. Falcon.[21]

In *Carey,* the United States Supreme Court considered the standing of a corporation, Population Planning Associates, Inc. [PPA], making mail order sales of nonmedical contraceptives and advertising its products in periodicals to challenge a New York statute prohibiting such distribution and advertising to persons under sixteen. Relying on *Craig v. Boren,* 429 U.S. 190, 192–97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976),[22] and a

---

**17.** 392 U.S. at 101, 88 S.Ct. at 1953, 20 L.Ed.2d at 962. *See generally,* Berger, "Standing to Sue in Public Actions: Is It a Constitutional Requirement," 78 Yale L.J. 816 (1969).

**18.** *Moore, supra,* 553 P.2d at 23–24.

**19.** *See Association of American Physicians and Surgeons v. Weinberger,* 395 F.Supp. 125, 137 (N.D.Ill.1975), aff'd 423 U.S. 975, 96 S.Ct. 388, 46 L.Ed.2d 299 (1975). The district court was not convinced that plaintiff doctors had standing to challenge the Professional Standards Review Legislation which required disclosure of certain medical data including the patients' names on the ground that it violated the constitutional rights of the patients. It noted:

> Under the circumstances of this case the claim of the plaintiffs on behalf of their patients is . . . premature. This suit attacks the constitutionality of the legislation on its face, and thus far there is no showing that a real and immediate injury exists . . .

**20.** The superior court found that Dr. Falcon had standing to assert the privacy interest of his patients on the ground that they were "unable to effectively protect their own rights." Although the state has not challenged this finding by way of cross-appeal, we note that, in general, a litigant lacks standing to assert the constitutional rights of another. *See United States v. Raines,* 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524, 530 (1960).

**21.** Normally, it would be sufficient to determine that a plaintiff was injured-in-fact in order to grant him standing to sue in his own right. Dr. Falcon faces arguable injury-in-fact. Our discussion of Dr. Falcon's own "injury" is supportive of our finding that he may assert the privacy rights of his patients. We do not reach the issue of whether Dr. Falcon could have standing to sue in his own right solely on the basis of prospective economic injury.

**22.** This case involved the requirements of the United States Constitution, art. III, regarding federal jurisdiction and presented the additional question of imminent harm—a request for injunctive but not declaratory relief. In *Craig,* the Court held that a vendor of 3.2 percent beer had standing to challenge in its own right and as advocate for the rights of third persons the gender-based discrimination in a statute that prohibited sale of beer to men, but not to women, between the ages of eighteen and twenty-one.

number of other recent cases,[23] it held that PPA is among the:

> vendors and those in like positions [who] have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function. 429 U.S. at 195, 97 S.Ct. at 456.

The court found that PPA had standing to challenge the law not only on its own right but on behalf of its potential customers. The corporation had a choice of obeying the statute, with a resultant economic injury, or of disobeying the statutory command and suffering legal sanctions.

Dr. Falcon had a similar choice although his economic injury is not as direct. We believe that if disclosure is required in all cases, potential patients may be deterred from seeking the services of a physician involved in state or local government. Moreover, although the economic injury to Dr. Falcon may not be as direct as that involved in the above-cited cases as a result of his ethical obligation, he and those similarly situated may be forced to choose between governmental service and professional pursuits.

■ We turn next to an analysis of the merits of the privacy claim.[24] While the federal right of privacy derives from a broad reading of the due process clause of the fourteenth amendment[25] or from "emanations" from other constitutional provisions,[26] the right to privacy in Alaska is guaranteed by an explicit constitutional provision—art. I, sec. 22 of the Alaska Constitution which states in part:

> The right of the people to privacy is recognized and shall not be infringed.

■ Neither the state nor the federal right to privacy is absolute, but it is part of the judicial function to ensure that governmental infringements of this right are supported by sufficient justification. Under the language of the federal cases, it must be found that the privacy invasion is necessary to a compelling state interest, that the governmental regulation does not sweep too broadly.[27] Under the Alaska Constitution, the required level of justification turns on the precise nature of the privacy interest involved. We have stated that, like interference with rights of privacy within the home, interference with certain relationships such as the doctor-patient relationship ordinarily mandates a very high level of justification.[28] There must be a "fair and substantial relation" between the statutory means and a legitimate governmental purpose.[29] Thus, to determine the validity of the disclosure provisions of the Conflict of Interest law, we must consider both the nature and the extent of the privacy invasion and the strength of the state interest requiring disclosure.[30]

■ The purposes of Alaska's Conflict of Interest law as set forth in AS 39.50.010 have been generally regarded as legitimate goals as have similar provisions in other

---

**23.** *Eisenstadt v. Baird,* 405 U.S. 438, 443–46, 92 S.Ct. 1029, 1033–1035, 31 L.Ed.2d 349, 356–58 (1972); *Sullivan v. Little Hunting Park,* 396 U.S. 229, 238, 90 S.Ct. 400, 405, 24 L.Ed.2d 386, 393 (1969); *Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510, 512–13 (1965); *Barrows v. Jackson,* 346 U.S. 249, 257–60, 73 S.Ct. 1031, 1035–1037, 97 L.Ed. 1586, 1595–98 (1953).

**24.** In deciding the question of standing, we did not adjudicate the merits of the dispute. For the purpose of standing, we assumed that a significant privacy interest was at stake.

**25.** *See Carey, supra* at 684, 97 S.Ct. 2010.

**26.** *See Griswold v. Connecticut, supra.*

**27.** *See Griswold v. Connecticut,* 381 U.S. at 485, 85 S.Ct. at 1682, 14 L.Ed.2d at 516; *Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147, 178 (1973); *Carey, supra,* 431 U.S. at 685, 97 S.Ct. 2010.

**28.** See Ravin, infra at 515 (Boochever, J., and Connor, J., concurring).

**29.** *Isakson v. Rickey,* 550 P.2d 359, 363 (Alaska 1976).

**30.** Since we rest our decision as to the validity of the law on the state constitutional grounds, we do not find it necessary to discuss the applicability of the federal standard.

states.[31] We agree with those courts and commentators which have found that financial disclosure laws have the purpose of promoting efficient, ethical government and preserving the integrity and fairness of the political process both in fact and in appearance.[32] One court which considered the constitutionality of a state conflict of interest law found the state's interest to be compelling but noted that "[e]ven when motivated by a compelling reason, the abridg-

ment of such rights must be accompanied by the least intrusive method." [33]

While other courts have also found this interest to be "compelling," outweighing claims of invasion of privacy of a public official or candidate and his family,[34] none has specifically considered the question presented here.[35] We, therefore, must determine whether the interest in disclosure to prevent conflicts of interest outweighs claims of privacy by the client of the public

---

**31.** The provisions of AS 39.50.010 are set forth at page ——, *supra.* In assessing legislative purpose, we have previously looked to the statutory statement of purpose on the assumption that the provision was enacted to further the expressed purpose. *See Isakson v. Rickey, supra* at 363. A similar assumption may logically be made where legislation is enacted by popular initiative.

**32.** *See generally,* The Constitutionality of Financial Disclosure Laws, 59 Cornell L.Rev. 345, 354–61 (1974), and cases cited at Note 8, *supra. See also, Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (reporting and disclosure provisions of federal Election Campaign Act of 1971 not unconstitutional).

**33.** Advisory Opinion on Constitutionality of 1975 PA 227, 396 Mich. 465, 242 N.W.2d 3, 20 (1976). *Advisory Opinion* and *City of Carmel-by-the-Sea v. Young,* 466 P.2d 225 (Cal.1970), found constitutional deficiency in the fact that the statutes were overbroad, not because there was not a compelling state interest justifying some invasion of privacy. Over a strong dissent, the court in *City of Carmel* found that the then existing California financial disclosure statute was invalid on the grounds that the legislation encompassed all persons holding office regardless of the nature and scope of their duties, and there was no effort to relate the disclosure requirements to specific, relevant interests. However, other courts have almost uniformly rejected or distinguished the reasoning in *City of Carmel.* For example, in *Montgomery County v. Walsh,* 274 Md. 502, 336 A.2d 97, *appeal dismissed,* 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 306 (1975), the court noted the difficulty of tailoring:

"disclosures to each of literally a myriad of public posts, and the anomaly of requiring each individual to make a personal determination as to what items of his financial affairs would be relevant."

In *Dunphy v. Sheehan,* 549 P.2d 332 (Nev. 1976), the Nevada Supreme Court struck down a financial disclosure law on grounds of unconstitutional vagueness. In its decision, the court did not reach the privacy issue. *Cf. Wisconsin*

*Socialist Workers 1976 Campaign Committee v. McCann,* 433 F.Supp. 540 (U.S.D.C.Wis. 1977) (Wisconsin campaign disclosure law applied to require Socialist Party to disclose identity of contributors held unconstitutional).

**34.** In fact, not all courts which have considered the constitutionality of campaign disclosure laws have agreed that the financial affairs of a candidate and his family are information encompassed within the constitutionally-protected right of privacy. In *Illinois State Employees Association, supra; Montgomery County, supra;* and *In re Kading,* 70 Wis.2d 508, 235 N.W.2d 409 (1975), the courts simply assumed *arguendo* that the federal right of privacy was applicable.

**35.** California's 1974 campaign disclosure law contained a broad "source of income" provision nearly identical to that of the Alaska statute. However, the Act was amended to clarify that disclosure of individual names was not required. Thus, when the California Supreme Court considered the law in *County of Nevada v. MacMillen,* 11 Cal.3d 662, 114 Cal.Rptr. 345, 522 P.2d 1345 (1974), the issue of the constitutionality of such disclosure was declared moot. An analogous question was raised in *Chamberlin v. Missouri Elections Commission,* 540 S.W.2d 876 (Mo.1976). At issue in *Chamberlin* was the constitutionality of a campaign finance and disclosure law which required attorneys to reveal the identity of their clients under circumstances similar to those presented here. Rejecting first the contention that the identity of a client was ordinarily within the scope of the evidentiary privilege, the court considered whether such disclosures would violate the fifth and sixth amendments and whether on this basis, the statute was overbroad. It declined to invalidate the statute on the basis of "highly speculative" claims of harm, and concluded that the legislation would stand until an actual case corroborated and justified the claim of anticipated harm and unconstitutional application.

official, as distinguished from claims of privacy by the official.

The decisions of both this court [36] and the United States Supreme Court [37] clearly establish that certain types of information communicated in the context of the physician-patient relationship fall within a constitutionally-protected zone of privacy. The nature and weight of a privacy interest in an individual's identity as a patient or client, however, presents a more difficult issue.

Although some courts have held that the right to privacy does not encompass an individual's identity in situations in which disclosure is not related to other constitutionally-protected activities such as speech or association,[38] there is federal authority to the contrary.

In *Roe v. Ingraham,* 403 F.Supp. 931 (S.D.N.Y.1975), a three-judge court [39] considered the constitutionality of legislation requiring a physician to disclose the names of patients who had received prescriptions for particular drugs having a high potential for abuse. Without addressing the identity of the patient as a distinct issue, it held that the federal constitution protected the doctor-patient relationship. The court stated:

[W]e read *Roe v. Wade* as holding implicitly and *Doe v. Bolton* as holding explicitly that the doctor-patient relationship is one of the zones of privacy accorded constitutional protection. . . . While the doctor-patient relationship involved in *Roe* and *Doe* concerned the most intimate personal relationships, sexual relations and "whether to bear or beget a child," and the right of privacy has primarily focused on home and family, it would be too restricted a reading of precedent for us to hold that the physician-patient relationship here is not constitutionally protected merely because it does not concern medical advice or professional judgments concerning child bearing. (citations omitted) 403 F.Supp. at 936.

. . . . .

An individual's physical ills and disabilities and the medication he takes, the frequency of his medical consultation are among the most sensitive of personal and psychological sensibilities. . . . There is fear that the adults or children will be stigmatized if their use of the drug becomes known. 403 F.Supp. at 937.

It concluded that since revealing the names of the patients did not further the purpose of controlling over-prescription and inhibiting trafficking, the legislation was overbroad and constitutionally invalid.

**36.** *See Ravin v. State,* 537 P.2d 494, 515 (Alaska 1975) (Boochever, J., and Connor, J., concurring):
[O]ther considerations [involving the right to privacy] would be the nature of the relationships involved (marital, doctor-patient, attorney-client, etc.), . . . .

**37.** *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Griswold v. Connecticut, supra.*

**38.** In *Schulman v. New York City Health and Hospital Corp.,* 38 N.Y.2d 234, 379 N.Y.S.2d 702, 709, 342 N.E.2d 501, 506 (1975), for example, the court rejected the contention that the inclusion of a patient's name on a pregnancy termination certificate, filed with the Department of Health, infringed on a constitutionally-protected zone of privacy. It concluded that there was "no compelling reason to extend the right to privacy beyond its recognized boundaries." *See Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668 (Tex.1976) (refusing claim that disclosure of records showing worker-claimant's name, injuries, employer and attorney fell within zone of privacy); *Felber v. Foote,* 321 F.Supp. 85 (D.Conn.1970) (no general privacy interest in doctor-patient relationship prohibiting disclosure of names of drug-dependent patients to Department of Health); Note, On Privacy, Constitutional Protection for Personal Liberty, 48 N.Y.U.L.Rev. 670, 770–72 (1973).

**39.** *Roe* was initially presented to the United States District Court for the Southern District of New York and was dismissed for want of a substantial federal question. 357 F.Supp. 1217 (S.D.N.Y.1973). In a decision by Judge Friendly, the Second Circuit reversed the lower court's order of dismissal and instructed the district judge to convene a three-judge court under the provisions of 28 U.S.C. §§ 2281 and 2284. *Roe v. Ingraham,* 480 F.2d 102 (2d Cir. 1973).

On appeal, the United States Supreme Court reversed, finding that the New York program, on its face, did not pose "a sufficiently grievous threat" to the patients' interests in either the nondisclosure of significant information or in making important decisions independently. *Whalen v. Roe,* 429 U.S. 589, 597–598, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). Pointing to the "security" provisions in the statute, the Court noted that public disclosure of patient identity and information was unlikely:

> There is no support in the record, or in the experience of the two States that New York has emulated, for an assumption that the security provisions of the statute will be administered improperly. And the remote possibility that judicial supervision of the evidentiary use of particular items of stored information will provide inadequate protection against unwarranted disclosures is surely not a sufficient reason for invalidating the entire patient identification program. (footnotes omitted) 429 U.S. at 601–602, 97 S.Ct. at 877–78.

We do not read the decision in *Whalen v. Roe* as a rejection of the district court's conclusion that where the identity of the patient may be linked with stigmatizing personal information, full public disclosure even for legitimate governmental purposes may invade a protected right of privacy. Rather, we regard the opinion as a recognition that where applicable rules or regulations insure that such information will be available only to authorized personnel in the context of a valid governmental program, no constitutional violation has occurred.[40]

Against the background of these state and federal cases, we turn to the facts of the instant controversy and to the mandates of the Alaska Constitution. Initially, we note that, ordinarily, disclosure of the names of persons who have paid more than $100.00 to a physician during a calendar year involves only a minimal invasion of privacy. In the general case, such disclosure indicates to the public only that these persons have seen a doctor. In contrast to the situation presented in *Whalen v. Roe,* it does not suggest the nature of their concern or their treatment.

In particular situations, however, as the state admits, disclosure of the mere fact that an individual has visited a certain physician may have the effect of making public certain confidential or sensitive information.

> According to one commentator:

> [s]ensitive information is that which a person desires to keep private and which, if disseminated, would tend to cause substantial concern, anxiety or embarrassment to a reasonable person.

As an example, the commentator suggests:

> the decision to have an abortion [is one] which many people would be reluctant to discuss even with their closest friends. . . . (footnotes omitted)[41]

Where an individual visits a physician who specializes in contraceptive matters or whose primary practice is known to be giving abortions and the fact of a visit or rendering of services becomes public information, private and sensitive information has, in our view, been revealed.[42] Even

**40.** The significance of regulations insuring confidentiality was also critical to the decision in *Association of American Physicians and Surgeons, supra.* The court held that the statute did not violate the physicians' right of privacy, emphasizing the statutory provision that the confidentiality of the information be maintained.

**41.** 3 Hast.Const.L.Q. 249, 251 (1976). For examples where certain types of data have been distinguished, *cf.* Prosser, Law of Torts, § 117 (4th ed. 1971); *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515

(1971); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**42.** In *Carey, supra,* 431 U.S. at 685, 97 S.Ct. at 2016, the Supreme Court stated:

> [The right of privacy was] first explicitly recognized in an opinion holding unconstitutional a statute prohibiting the use of contraceptive[s] . . . . . This is understandable, for in a field that by definition concerns the most intimate of human activities and relationships, decisions whether to accomplish or to prevent conception are among the most private and sensitive. (citations omitted)

visits to a general practitioner may cause particular embarrassment or opprobrium where the patient is a married person who seeks treatment without the spouse's knowledge or a minor who does so without parental intelligence.[43] Similar situations would be presented where, because of a specialized practice, the disclosure of the patient's identity also reveals the nature of the treatment, and the particular type of treatment is one which patients would normally seek to keep private. Some examples would include the patients of a psychiatrist, psychologist or of a physician who specialized in treating sexual problems or venereal disease.

In these situations, at least, we find that the extent to which the governmental interest in promoting fair and honest government would be impeded, does not outweigh the individual's privacy interest in protecting sensitive personal information from public disclosure. In emphasizing these examples, we reiterate that situations involving specialized practice of psychiatry or venereal disease present the exception rather than the general rule and that, ordinarily, identification as a patient of a general practitioner who also engages in some of these functions does not infringe a significant privacy interest.

█ Neither the Conflict of Interest law nor any applicable regulations provide a method for exempting certain classes of patients or physicians from the disclosure requirement or for determining whether certain patients fall within special or sensitive classes. The state has suggested that all privacy claims should be resolved on a case-by-case basis. In our view, however, a case-by-case determination would be excessively burdensome for the doctor, the patient and for the courts.[44] AS 39.50.050 requires the Alaska Public Offices Commission to promulgate regulations to implement and interpret the provisions of the law. Determination and designation of exempted classes of patients or physicians may best be accomplished by means of regulations enacted with the safeguards and opportunity for public participation provided by Alaska's Administrative Procedures Act (AS 44.62).[45] To prevent invasion of the right to privacy guaranteed by art. I, sec. 22 of the Constitution of the State of Alaska, we hold that until appropriate regulations are promulgated, the Conflict of Interest law may not be applied so as to require reporting the names of individual patients of a physician. In addition, the Commission may well wish to promulgate regulations which apply to relationships other than that of physician-patient.

REVERSED IN PART.

---

43. The Supreme Court has recently ruled that a minor may obtain an abortion without the consent of a parent or person *in loco parentis. Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). *See also,* AS 09.65.100(4) which permits a minor to consent to diagnosis and treatment of pregnancy or venereal disease without the necessity of parental consent.

44. *But cf., Baird v. Koerner,* 279 F.2d 623 (9th Cir. 1960).

45. We do not suggest the form or scope of such regulations. They may be specific or very general in nature so long as they provide a method by which a physician may present a claim of exemption to the Commission for its ruling in such a manner as to preserve the confidentiality of the patient's name. In the event that the physician does not present such a claim, the patient should be afforded a similar right. The Commission may well wish to expand the regulations so as to apply to other relationships.